Parham *vs.* The Justices, &c. Decatur County.

No. 66.—Ransom Parham, plaintiff in error, *vs.* The Justices of the Inferior Court of Decatur County and others, defendants in error.

[1.] Private property may be taken for public use without compensation, in cases of extreme necessity, without the consent of the owner; for example, the pulling down of houses, and raising bulwarks for defence against an enemy, or for the erection of ramparts against an invading foe.

[2.] The general rule is, that private property cannot be taken for public use, without just compensation; and cannot be so taken without an Act of the Legislature authorizing it, and the Act must make provision for the compensation.

[3.] That provision of the Federal Constitution, which prohibits the taking of private property for public use, without just compensation: *Held* to be an affirmance of a great principle of the Common Law.

[4.] The Legislature must judge of the necessity or utility of the exercise of the right of eminent domain for public improvements; but in case of gross abuse of it, as when, under pretext of public utility, the property of A is taken and given to B, the Courts will interfere and set aside the law.

[5.] The laws of this State, which authorize the opening of public roads over unenclosed lands, without just compensation, held to be void.

[6.] Under the laws of Georgia which authorize the laying out and opening of public roads over the enclosed lands of the citizen, the Inferior Court may order a review, for the purpose of determining whether a road be necessary or not, and may also order the same to be opened before compensation is made or tendered; but cannot enter upon and seize, and permanently appropriate the land, until compensation is made or tendered.

[7.] A citizen cannot enjoin the opening of a public road over his enclosed lands, when it appears from his bill, that he has not taken the steps pointed out by the law to procure the assessment of his damages.

[8.] Nor upon the ground that the reviewers appointed by the Inferior Court, signed the petition for the road, and took an active interest in getting it up.

[9.] Nor upon the ground that it does not appear, from the return of the reviewers, that they were not sworn according to the requirement of the Statute.

Application for an injunction, in Decatur Superior Court. Decision by Judge Warren, 6th of December, 1850.

This was an application for an injunction to restrain the Inferior Court and Commissioners of Roads, from opening a new

public road, passing through the enclosed and unenclosed lands of complainant, Ransom Parham.    The bill alleged, that a petition was presented to the Court for the opening of this road, signed by many persons who did not live in the neighborhood; that the same was gotten up, not for the public convenience, but by persons interested in having a road to a certain landing on Flint River, where the new road would cross; that a counter petition was presented to the Court, which they refused to consider; that the Court evidenced their partiality in the appointment they made of reviewers and commissioners to open the road—the same not being proper and discreet persons—one of them wishing the road to pass his house, where he kept spirits to retail; that another had but lately removed into the County, and the third having acted as main agent in procuring signatures to the said petition, and all of them being among the petitioners for the road; that complainant objected to their appointment, or the appointment of any one, because the road prayed for was not required for the public convenience, nor was it the nearest and most practicable route between the points specified as the *termini* of the road; because it would cause irreparable injury to the land and growing crop of the complainant, and because complainant offered to the Court, at his own expense, to cut out and open a shorter and better road between the points designated; that the Court, notwithstanding his objections, appointed the reviewers, two of whom afterwards reported that they had viewed and marked out the contemplated road; which return complainant objected to as illegal—

1st. Because one of the commissioners failed to act or join in the report; and

2d. Because it did not appear that the commissioners, before entering upon their duty, were sworn (as required by law) before a Justice of the Peace;

That the Court overruled the objections, and granted an order opening the road—the execution of which order was now sought to be enjoined.

By an amendment to the bill, it was alleged, that the Inferior Court had not, nor had any of the defendants paid, or offered to

pay, any of the damage, (amounting to at least $2500,) which would be done to the land of complainant, but threatened to proceed to open the said road, without and before paying, or offering to pay the same; whereas, by law, he was advised and believed, that no authority or power was vested to open said road, until the damages were paid, or full and just compensation tendered to complainant.

The prayer was for a perpetual injunction to restrain defendants from cutting a road through complainant's land, whether enclosed or unenclosed; or at least, they should be enjoined, until full and just compensation should be paid or tendered to complainant.

Upon hearing argument, the presiding Judge refused to grant the injunction, upon the following grounds:

1st. Because the laying out and altering new and old roads, is expressly within the power and control of the Justices of the Inferior Court, subject alone to their discretion as to whom they shall appoint to review, lay out and open said road.

2d. Because as to improved or enclosed lands, the Statute of 1799 provided compensation to those injured by the opening said roads, and that if the provisions of that Statute were followed, the Inferior Court may take any improved lands they please for such road; and after such lands are thus appropriated, if the owner feels himself aggrieved, he may have the damages assessed by a Jury, and enforced by mandamus.

3d. Because the defendants, by the Act of 1818, have the right, power and authority to take and appropriate the wild and unenclosed lands of complainant, without any compensation—the Court holding the said Act to be constitutional and valid.

To these rulings and decision of the Court, exceptions were filed, and error has been assigned thereon.

S. T. BAILEY, for plaintiff in error.

LAW & SIMS, represented by B. HILL, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

The presiding Judge held, in this case, that it was competent for the Inferior Court, under the laws of this State, to lay out and open a road through the *unenclosed* lands of the complainant. This power is denied in this record. We are, therefore, called upon to determine whether, according to laws now in force in Georgia, the Inferior Court can exercise this power. It is a question of some magnitude in principle, and of great practical moment. It is very clear, that the Legislature may take the property of a citizen for purposes of public necessity or public utility. All grants of land are in subordination to the eminent domain which remains in the State; and from the necessities of the social compact, they are subject to this condition. The sovereign authority of the State, acting through the Legislature, is bound to protect and defend the State, and to promote the public happiness and prosperity of the people; and the Legislature is to judge when the public necessity or public utility requires the appropriation of the property of the citizen. I need not enlarge upon these propositions—they are the law of this Court, more than once promulgated. Nor do we deny, that a highway is a work of public utility. It is necessary to commerce and intercourse. Nothing can be more conducive to the social well-being and commercial prosperity of a State, than roads. It were pagan and aboriginal not to have them. Our doctrine farther is, however, that the property of the citizen cannot be taken for any purpose of public utility or convenience, unless the law which appropriates it, makes provision for a just compensation to the proprietor. This is true at Common Law, according to the *lex terræ* recognized and affirmed by *Magna Charta*, and it is true by the special ordainment of the Constitution of the United States.

I propose first to show, that the several Acts of the Legislature authorizing the building of roads, make no provision whatever for compensation, when the *unenclosed* lands of the citizen are taken for the purpose of a highway. The authority to lay out roads, is vested in the Inferior Court, by the Acts of 1799 and of 1818. Prior to 1799, the Inferior Court could and did lay out roads, but I find no Act of the Legislature, prior to that

time, which gives them any powers in relation to roads, different from those conferred by the Acts of 1799 and 1818. These two Acts contain all the provisions of law of force in this State relative to laying out public roads, and making compensation to the citizen. By the 1st section of the Act of 1818, it is declared, that " On application to the Inferior Court for any new road, or any alteration in an old road, the said Justices shall proceed to appoint three discreet and proper persons, residing in the neighborhood where such road is intended to pass, and in case they find it of public utility, they may proceed to mark out the same, on oath taken before any Justice, and report to said Court—the Clerk of which is hereby required to notify the Commissioners of Roads of such report." *Prince,* 735.

By the 19th section of the same Act, it is declared, that " In all cases where commissioners have been or may hereafter be appointed for the purpose of reviewing any new road intended to be laid out, and shall report to the Inferior Court the propriety of opening the same, the said Court may, if they or a majority of them deem it adviseable, pass an order for opening such road." *Prince,* 739.

Here, then, we have a general power to lay out roads deposited with the Inferior Court. The Legislature has made them its agents for the exercise of the sovereign power over this subject matter. They are, however, subject to the paramount authority of the Legislature. Notwithstanding this delegation of power, the Legislature may, if it will, exercise it. It is not pretended that there is any authority for the laying out and opening this road, but the general Acts before referred to. The only provision of law for making *compensation* in cases of a public road, is found in the second section of the Act of 1799, which was re-enacted by the 34th section of the Act of 1818. The 2d section of the Act of 1799, is in these words: " And when any person or persons shall feel him, her or themselves aggrieved by reason of any road being laid out through his, her or their *enclosed* ground, it shall be the duty of any two or more of the Justices of the Inferior Courts, on application in writing by the person or persons injured, to issue a warrant, under their hands, directed

to the Sheriff of the County, to summon a Jury of freeholders, who shall be sworn to assess such damages; and that the Sheriff shall make and return a true inquisition thereof to the next Inferior Court; and it shall be the duty of such Court to order the amount of damages so assessed, to be paid out of the next County tax, or out of any public moneys belonging to the County fund: *Provided, nevertheless*, that when it shall appear to the Inferior Court, that the damages so assessed transcend the utility of that part of said road, such Court shall order the same to be altered in such manner as to avoid the *enclosed* ground so damaged, unless the person complaining shall agree to accept such compensation as shall be deemed just and reasonable by said Court." *Prince*, 733, 740.

This law makes provision for compensating the owner *only* when a public road is laid out through his *enclosed* ground. There is not, so far as I can ascertain, any provision in our laws for compensating the owner, where a road is laid out through his unenclosed or wild lands. Nor does it seem that this is a legislative oversight, for by designating enclosed grounds, they are to be held, as of purpose, excluding all other grounds. *Expressio unius est exclusio alterius.* Whatever may have been the reason of excluding other lands than enclosed lands from compensation; whether it was because of the additional value which opening and enclosing land gave to it, or because of the idea that unenclosed land, by reason of its abounding quantity at that day within our limits, had no or very little depreciable value; or, which is the likelier reason, because the Legislature believed that the opening of roads through the then greatly unsettled parts of the country, would enhance the value of lands over which they were laid out, quite equal to the damage caused by their appropriation; it is true, that they were excluded by the Act of 1799, and to this day they remain excluded. The law, as it now stands, has been acquiesced in by the people of this State for many years; indeed, I believe from the organization of the State Government. I do not know that the power of the Legislature to assume the unenclosed lands for the purpose of a highway has been, in a single instance questioned before the

Courts of Justice.   The people have felt no serious inconve-
nience from it.   On the contrary,  the advantages of roads as the
means of intercommunication—as the means of developing the
resources of a  country comparatively new, and  a large portion
of which has been and is yet but sparsely settled—have been so
great and so obvious, that there has been no necessity or utility,
until of late, in questioning it.   Nor has there been manifested
in the Legislature, any disposition to use the power oppressive-
ly.   Acting in this matter heretofore, mainly through the Inferior
Courts of the Counties—officers selected by the people from
among themselves, with interests identified with them, and sym-
pathies in harmony with theirs—the Government has used the
power without abusing it, wisely and beneficially.   The condi-
tion, however, of things in this State in reference to this matter,
has become, of late years, widely different from what it was in
1818.   Our limits being fixed—the Indians being removed, and
our whole territory organized and subjected to the civil and
criminal jurisdiction of the State, population has prodigiously·
increased—agriculture has improved—the mechanic arts, to a
great extent, have been every where introduced—commerce has
widened and deepened her channels, and lands have risen in val-
ue.   Emigration to other States has decreased, and our popu-
lation is becoming permanent.   Our territory may be said to be
literally covered with rail road  and plank road  charters, using,
by legislative grants, the lands of the people.   These things
give to the question before us a seriousness and vitality which it
has not heretofore possessed.   It has become a serious affair for
the planter to yield his rich plantation to be traversed through
its whole extent with highways—for the poor man to give up,
perhaps, one third of his small farm, whether enclosed or not, to
the public convenience and utility, as indicated in some magni-
ficent rail road project, or some wide turnpike thoroughfare.   In
many parts of the State, unopened lands are more valuable than
cultivated fields, if for nothing else, yet for the timbers upon
them.   In the earlier settled Counties of the State, I venture to
say, that there are few plantations where the owner could not

better afford to give to the Government a field, than the same number of acres of timbered land.

It may be, it doubtless is true, that our people have as good reason to confide in the justice and forbearance of the Legislature as they ever had. It may be, that in all the future, the Legislature may not, in a single instance, assume the land of the citizen, without a just compensation. We know not. But this we do know, that the power of government ever tends towards enhancement and encroachment. Corporation influence may become too strong for legislative resistance. Capital combinations may wield a power too potent for the popular will. Degeneracy may seize the times, and the virtues of simple, honest revolutionary republicanism depart. *The sacredness of private property ought not to be confided to the uncertain virtue of those who govern.* Principles conservative of popular rights, cannot with safety be abandoned; for if once abandoned, all history teaches that it is difficult, almost impossible, to resume them.

. The general doctrine, that private property cannot be taken for public use, without compensation, has been more than once held here. The question, it is true, has come before us, except in one instance, in the construction of rail road charters, or bridge or ferry grants. The principle is the same in this case. Whether the property of a citizen can be taken at all or not, depends upon the use or necessity which requires it. The principle upon which the right of way for a rail road has been sustained is, that the rail road is of public utility, and, therefore, when property is taken for that object, it is taken for public use. So, in the case of a public road, the ground of the rightful assumption is public use. If, in the former case, compensation must be made, as we have held, so in the latter case. I see no difference, so far as the principle is concerned, between a common highway and a rail road. The former is, no doubt, more unequivocally for the public use than the latter, and that is all. Still, I propose to state again the grounds and the authorities upon which our decision rests.

[1.] It is not to be doubted but that there are cases in which private property may be taken for a public use, without the con-

sent of the owner, and without compensation, and without any provision of law for making compensation. These are cases of urgent public necessity, which no law has anticipated, and which cannot await the action of the Legislature. In such cases, the injured individual has no redress at law—those who seize the property are not trespassers, and there is no relief for him but by petition to the Legislature. For example : the pulling down houses, and raising bulwarks for the defence of the State against an enemy ; seizing corn and other provisions for the sustenance of an army in time of war, or taking cotton bags, as Gen. Jackson did at Orleans, to build ramparts against an invading foe.

These cases illustrate the maxim, *salus populi suprema lex.* Per *Buller, J. Plate Glass Co. vs. Meredith,* 4 *T. R.* 797. *Noy's Maxims,* 9*th* ed. *p.* 36. *Dyer,* 60, *b.* *Broom's Maxims,* 1. 2 *Bulst.* 61. 12 *Coke,* 13. *Ib.* 63. 2 *Kent's Com.* 338. 1 *Bl. Com.* 101, *note* 18, *by Chitty.* Extreme necessity alone can justify these cases and all others occupying the same ground.

[2.] This rule of necessity has a very narrow application, and is an exception, indeed, to the general rule, which is, that when public necessity or utility requires the assumption of private property, it can only be done by the act of the Legislature, and the Legislature must make provision for compensation. If it does not, the Courts may pronounce the law a nullity.

[3.] This was the law of the land in England, before Magna Charta. Against the contrary the great Charta guarded, by declaring that no individual should be deprived of his property, but by the law of the land, and by judgment of his peers. The petition of rights affirmed the same doctrine ; and this great rule of right and liberty was the law of this State at the adoption of the Constitution. It is not, therefore, necessary to go to the Federal Constitution for it. It came to us with the Common Law— it is part and parcel of our social polity—it is inherent in ours, as well as every other free government. At Common Law, the Legislature can compel the use of private property, but not arbitrarily. It treats with the citizen, as owner, for the purchase, and whilst he cannot withhold it upon offer of compensation, they cannot seize it without such tender. The Legislature, says

*Blackstone*, interfered, " not by absolutely stripping the subject of his property in an arbitrary manner, but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual, for an exchange. All the Legislature does, is to oblige the owner to alienate his possessions for a reasonable price, and even this is an exercise of power which the Legislature indulges with caution, and which nothing but the Legislature can perform." *Black. Com. vol.* 1, *p.* 139. The British Parliament have frequently recognized this doctrine of the Common Law. For example : in the Highway Acts of 13 *George III. and* 3 *George IV.* the surveyor of highways is required to offer the owner of the soil over which a new road is to pass, a reasonable compensation, which if he refuses to accept, the Justices shall certify their proceedings to some general quarter sessions, who are required to impannel a Jury to assess damages within a given limit. *Black. Com.* 101, *note* 19, *by Chitty.* Indeed, it may be safely asserted, that the British Courts, acting in obedience to their ancient constitutions of government, have, in rare instances, except in the cases of urgent necessity above referred to, recognized the right of the State to assume private property without providing for a just compensation. The principle is admitted by the ablest writers, as being founded in natural equity and of universal application. *Grotius, De Jure B. & P. b.* 8, *ch.* 14, §7. *Puffendorff de Jur. Nat. et Gent, b.* 8, *ch.* 5, §7. *Bynhershock's Quest. Jur. Pub. b.* 2, *ch.* 15. *Vattel, b.* 1, *ch.* 20, §244. *Heinic. Elem's Jour. et Nat. b.* 2, *ch.* 8, § 170. 2 *Kent's Com.* 339. *Story on the Constitution,* §1784. 2 *Johns. C. R.* 162. 5 *Miller's Lou. R.* 416. 3 *Howard,* 240. 26 *Wend.* 497. 1 *Bald. C. C. Reports,* 205. 11 *Peter's R.* 638, 641, *by Story, J.*

This great and indispensable rule of property is embodied in the Code Napoleon, (*art.* 545,) in the constitutional charter of Louis XVIII, (2 *Kent's Com.* 340, *note,*) in the Civil Code of Louisiana, (*art.* 489,) in the Constitution of several of our States, in the bill of rights of others, and in the Constitution of the United States. *Article 5th of Amendments to the Constitution of*

Parham *vs.* The Justices, &c. Decatur County.

*the United States.* It has been recognized in Turkey, according to Mr. *J. Waties,* in *Lindley et al. vs. Commissioners,* (2 *Bay. R.* 60,) upon the authority of *De Tott's Memoirs of the Turkish Government.* The Constitution of the United States upon this point, I know, has been held to be a restraint upon federal legislation alone, and not to apply to the States. If that be admitted, yet it is still authority, most significant, for the application of the rule in the States. It is the affirmation of the rule in the most solemn form. It is the declaration of the opinion of the American people, that the governmental right of appropriating property, is subject to that limitation. In creating a government of limited and merely delegated powers, with a careful vigilance over the rights of the people, as derived from the Common Law—the great charter and petition of rights—it was a matter of commendable caution, to embody this limitation in the Constitution. Mr. *Story* says, that this article of the Constitution "Is an affirmance of a great doctrine established by the Common Law, for the protection of private property." *Story's Com. vol.* 3, §1784. Upon *his* authority then, it is a Common Law doctrine. Nor does he stand alone, for such is the concurring opinion of the British and American books. Now, it would be weak reasoning to say, that because the people of the States have denied to the Federal Government the right to assume private property for public use without compensation, they have thereby conceded it to the State Governments. The contrary inference is irresistible, to wit: that the people, feeling protected in the States by this limitation on the power of the State Governments, were induced to make sure of the same protection from the Federal Government, and that the fifth article of the amendments to the Constitution is to be held and taken as a solemn avowal, by the people, that a power to take private property, without compensation, does not belong to any government. *Per Ruffin, Ch. J.* 2 *Dev. & Batt.* 460. 3 *Kelly,* 31. *Ib.* 333. 6 *Ga. Rep.* 130. 9 *Ib. ante,* 37. 20 *Johns. R.* 106.

In 1796, the Supreme Court of South Carolina were divided upon the question, whether the State could assume private property for the purpose of a highway, without compensation.

Judges *Grimke and Bay* holding that it could—analogising the power to lay out and open roads, streets, &c. to the taxing power. Judges *Burke and Waities* dissenting. The analogy between this and the taxing power does not hold. All property is held subject to an *equal* burthen of taxation. Each citizen is presumed to pay, and ought, in fact, only to pay his equal proportion of taxes needful for the support of the government. If private property is taken to build a road, and no compensation is awarded, then the burthen of providing roads for the public, falls with onerous inequality upon those citizens over whose lands the roads happen to run. They pay their proportion of the general taxes, and of those raised to defray the expenses of opening roads, and in addition they give up their lands for the right of way. There is no equality, no justice in this. The sovereign right to lay and collect taxes, grows out of the paramount necessities of government—an urgent necessity which admits no property in the citizen, whilst it remains unsatisfied. The right to tax is coeval with all government. It springs out of the organization of the government. All property is a pledge to pay the necessary expenses of the government; but the burthen must be equally borne. A law which raises the taxes out of one man or class of men, the balance going free, would be contrary to natural right and justice, just as a law which would constrain one or a few to pay the expenses of a highway would be ; and both would be set aside as nullities. See *Doe, ex dem. Gledney and another vs. Deavors,* 8 *Ga. R.* 479. The argument of Judge *Waities,* in the case referred to from South Carolina, is a sufficient reply to the rather feeble opinion of his adversary colleagues. 2 *Bay,* 38. Without noticing the intermediate cases in that State, I think it may be safely said, that if this ever was the doctrine of the Carolina Courts, it is not at this day. I have referred to the case in *Bay,* the more especially because his honor, Judge *Warren,* and the Justices, *Grimke and Bay,* agree in analogising the power to open roads to the taxing power, and because it is the starting point of a series of adjudications, in that State, upon the subject. Our judicial brethren of Carolina, if one might judge from the reported cases, were not, until as

late as 1838, very well agreed upon this question.    See *the case of Dawson vs. The State, Riley's Law Cases*, 103, *and particularly the opinion of Richardson, Justice, which is an able review, not only of the Carolina cases, but of the whole doctrine.*    Up to that time it is rather hard to say what had been precisely the law of that State.    I think it was, that the Legislature might assume private property for the purpose of a highway, *without compensation*, and this covered the whole ground—for if for a highway, then for every purpose of public necessity or utility.    But in the case of *The Louisville, Cincinnati and Charleston Rail Road Company vs. Chappell*, determined by the Court of Errors in 1838, it appears that both the Legislature and all the members of the Court agree, that private property may be taken for public use, and the " only restriction is, that private property cannot be taken without just compensation to the owner."    I say the Legislature agree, because, in the charter of that company, they require compensation to be made.    1 *Rice's Rep.* 383.    All the ruling upon this matter, in that State, prior to this case, must be considered as reversed, unless it is possible to draw a distinction in the application of the principle between a rail road and a common highway, which I must hold to be impossible.    So that the Carolina Bench having corrected what, with great deference, seems to me a grave error, its authority cannot be invoked to sustain the judgment of the Court below in this case.

[4.] The damages to an individual in the assumption of his land for a highway, may be small, and in most instances are small; and it may be claimed as an obligation growing out of a proper public spirit, to relinquish them without remuneration. There are cases, though, where they may be great.    But the question is not one of relative pecuniary loss and gain alone—it is one of fundamental principle.    The question really is, whether property is held by rules which Courts are compelled to enforce, or at the will of the Legislature?    If by the will of the Legislature, then what security is there for property?    It may be said, that the security is found in the limitation of the power to works of necessity and utility, and that although the Legislature may judge, in the first instance, of the necessity and util-

ity, yet their judgment is subject to the corrective judgment of the Courts. If the Legislature should pass a law to transfer the property of A to B, under pretext of public necessity and utility, when no such necessity or utility exists in fact, there can be no doubt but that it would be the right and duty of the Judiciary to set it aside. 2 *Peters*, 653. 3 *Yerg.* 41. 11 *Wend.* 149. 19 *Ib.* 659. 16 *Mass.* 330. 5 *Paige*, 146 to 160. 2 *Kent*, 340. But it is not settled, I apprehend, that the Legislature has not the sole right of judging of the expediency of exercising the right of eminent domain, for the purpose of public improvement: as, for example, for the purpose of a public road, to be laid out and opened, and kept up by the public. In the case of *Varick vs. Smith*, the Chancellor asserts for the Legislature, the sole right of judgment, in these words: " I admit, that the two branches of the Legislature, subject only to the qualified veto of the Executive, are the sole judges as to the expediency of making police regulations interfering with the natural rights of our citizens, which regulations are not prohibited by the Constitution; *and, also, as to the expediency of exercising the right of eminent domain, for the purpose of making public improvements, either for the benefit of the inhabitants of the State generally, or any particular section thereof.*" 5 *Paige*, 160. Chancellor *Kent*, doubtless, states the true rule. The Legislature, as a general rule, have the sole right of judgment; but if it is grossly abused, as in the case above put, the Courts may review it. 2 *Kent*, 340, '41. The restraint, then, which the Courts can exert upon the will of the Legislature, would be small. One of the restraints upon bad legislation in this regard, is the price which the people have to pay, by taxation, for the private property which is taken for public use. It is not reasonable that the Legislature will abuse the power, when their constituents pay for the right of way; but if it may be taken without compensation, then, practically, property is held at the will of the Legislature. Under our State Constitution, the General Assembly has power to make all laws and ordinances which they shall deem necessary and proper for the good of the State, which shall not be repugnant to the State Constitution. *Prince*, 905. This is a broad grant.

It is limited expressly by the State Constitution, and necessarily, by the Federal Constitution, and by certain great fundamental principles not embodied in either. But suppose the principle of compensation for private property be held not to be one of those fundamental principles, then, under the Constitution, in relation to the assumption of private property, there is no limitation but the opinion of the Legislature, as to what may be necessary and proper for the good of the State. The necessity or utility of a road or other improvement, will depend upon the question, whether, in the opinion of the Legislature, it is necessary and proper for the good of the State? What is for the good of the State—what corporations, grants, privileges—how much and how often private property may be taken? are inquiries which open to the Legislature a field of discretionary power, almost without bounds—a discretion which places the sacred right of property very much within their control—a discretion which no wise people will tolerate. If the progression of this age requires the frequent exercise of the right of eminent domain, the necessity of right and liberty require, that the citizen be paid when he is injured by it; and this Court is here to see to it that he is paid. The right of accumulating, holding and transmitting property, lies at the foundation of civil liberty. Without it, man no where rises to the dignity of a freeman. It is the incentive to industry, and the means of independent action. It is in vain that life and liberty are protected—that we are entitled to trial by Jury, and the freedom of the press, and the writ of *habeas corpus*—that we have unfettered entails, and have abolished primogeniture—that suffrage is free, and that all men stand equal under the law, if property be held at the will of the Legislature.

[5.] Our judgment, therefore, is, that the injunction be granted, so far as relates to that part of this road which is laid out over the unenclosed lands of the complainant. The law ought to be so amended, as to provide for compensation in such cases, and no doubt will be at the next session of the Legislature, and the attention of the General Assembly is respectfully invited to the subject.

The motion for the injunction as to the *enclosed* lands, was

sought to be sustained upon several grounds, all of which were properly overruled by the presiding Judge.    First, it is assumed in the argument, that the provision for compensation in the Act of 1799, relates only to roads which had been before that time laid out and opened; that having no prospective operation, there is no law providing compensation for new roads laid out over enclosed grounds, and, consequently, none for compensation in this case.    Such is not our construction of the Statute.    The language of the Act is, " When any person or persons shall feel him or themselves aggrieved, by reason of any road *being laid out* through his, her or their enclosed grounds," &c. &c.    Being laid out is not to be understood in the past tense, in the sense of having been laid out, but in the present tense, in the sense of being now laid out, and applies to all roads in process of being laid out at any time.    This is too plain to require farther notice.

[6.] Again, the injunction was asked upon the ground, that the Inferior Court, acting for the public, had no right to take the land of the complainant, *before and until* a just compensation had been made.    The authorities agree mainly in this, that the compensation, or offer of it, must precede or be concurrent with the *seizure and entry upon* the property to construct the road. *Thompson vs. Grand Gulf R. R. & Banking Co.* 3 *Howard's Miss. Rep.* 240.    *Lyon vs. Jerome,* 26 *Wend.* 497.    *Bonaparte vs. C. & A. R. R. Co.* 1 *Bald. C. C. U. S. Rep.* 205.    2 *Johns. Ch. R.* 162.    5 *Miller's Louisiana Rep.* 416.    *Kent's Com.* 340, note.    In *Younge vs. McKenzie, Harrison et al.* (3 *Kelly,* 45,) this Court hold the same rule, and say, " We do not intend to say, that the company could not have entered upon the land, made the necessary survey and examination of the premises, under the authority of the Legislature, for the purpose of locating the eastern abutment of the bridge; but we do intend to say, the company had no authority to appropriate the private property of the defendants to the *permanent and exclusive use* of the company, until just compensation had first been made therefor, in the manner pointed out by the charter."    By this ruling, which is in accordance with the doctrine laid down by *Kent, Walworth, the Mis-*

Parham *vs.* The Justices, &c. Decatur County.

*sissippi Court,* and other authorities last referred to, the property cannot be permanently and exclusively appropriated until compensation is made or offered; that is, it must be made or offered before or cotemporaneously with the *seizure and entry upon* the land; but the Court or its agents may enter upon the land to review it, with the object of determining upon the practicability and utility of the road. They may do more—they may, upon the report of the reviewers, order the road to be opened, before making or offering compensation, because this is not an actual seizure of the land—it is not a permanent and exclusive appropriation of it. Now this, by the statements of the bill, is all that the Court has done in this case. They appointed the reviewers, heard their report, and ordered the road to be opened. It charges farther, only, that complainant fears that the commissioners will proceed to open the road.

[7.] But apart from this view of the matter, according to his own showing, the complainant is not entitled to relief. Under the Act of 1799, the Court is not in laches, and he is. That Act provides, that any person aggrieved by a road being laid out over his enclosed grounds, may apply, in writing, to any two or more of the Justices of the Inferior Court, whose duty it shall be to issue a warrant, and cause a Jury to be impanneled to assess his damages. He has made no such application—he has not complied with the law. *Non constat,* that the Court refuses to pay the damages, but we are left to infer, that as sworn officers, they will do their duty and pay them, when he comes forward to ask, and a Jury has assessed them. The law offers the compensation if he asks it. If he does not, he is presumed to be satisfied. He has an ample remedy at Law. At this moment the Court have not, because they have not seized the land, put themselves in a position to be enjoined. Notwithstanding all this, he claims equitable relief. Let him go and demand the assessment, as the Statute directs, and if the Court refuse to issue a warrant to impannel a Jury, or do, or fail to do anything which is in violation of the law, and they or their agents then seize his lands to open the road, Chancery will, no doubt, listen to his complaint.

[8.] Again, the injunction is claimed because the reviewers appointed by the Court were not impartial but interested persons. The specification as to one, who by the by it is admitted in the bill did not sign the report, is, that he keeps a grog-shop on the line of the new road, and his custom would be increased by opening it. We cannot presume partiality from these facts. As to the other two, it is charged, that one has but recently come into the County, and signed the petition for the new road—the other was a main agent in getting up the petition, and also signed it. The road cannot be arrested on these grounds. The law directs, that the Court appoint three discreet and proper persons, residing in the neighborhood where the road is intended to pass, to make the review. We are to presume that they are discreet and proper persons, until the contrary appears. An interest, to disqualify them, must be shown to be an immediate, direct interest in the laying out the road, as distinguished from that general interest which each citizen has in a highway. There is no charge of fraud or collusion.

[9.] It is also charged, that it does not appear from their return, that they were sworn. The law requires them to be sworn, and it were better that that fact should appear on the return. The bill does not charge that they were not sworn. In Equity, without such allegation, complainant is not entitled to relief on that score.

Let the judgment be reversed, and the motion for the injunction be granted, so far as that part of the proposed road is concerned which is laid out through the unenclosed lands of the complainant.