## UNITED STATES *v.* CALTEX (PHILIPPINES), INC. ET AL.

No. 16.   Argued October 20, 1952.—Decided December 8, 1952.

*Assistant Attorney General Baldridge* argued the cause for the United States.   With him on the brief were *Acting Solicitor General Stern, Robert W. Ginnane, Paul A. Sweeney* and *Benjamin Forman.*

*Albert R. Connelly* argued the cause for the Shell Company of Philippine Islands, Ltd. et al., and *Leo T. Kissam* for Caltex (Philippines), Inc., respondents.   They also were on a brief for respondents.

Mr. Chief Justice Vinson delivered the opinion of the Court.

Each of the respondent oil companies owned terminal facilities in the Pandacan district of Manila at the time of the Japanese attack upon Pearl Harbor. These were used to receive, handle and store petroleum products from incoming ships and to release them for further distribution throughout the Philippine Islands. Wharves, rail and automotive equipment, pumps, pipe lines, storage tanks, and warehouses were included in the property on hand at the outbreak of the war, as well as a normal supply of petroleum products.

News of the Pearl Harbor attack reached Manila early in the morning of December 8, 1941. On the same day, enemy air attacks were mounted against our forces in the Philippines, and thereafter the enemy launched his amphibious assault.

On December 12, 1941, the United States Army, through its Chief Quartermaster, stationed a control officer at the terminals. Operations continued at respondents' plants, but distribution of the petroleum products for civilian use was severely restricted. A major share of the existing supplies was requisitioned by the Army.

The military situation in the Philippines grew worse. In the face of the Japanese advance, the Commanding General on December 23, 1941, ordered the withdrawal of all troops on Luzon to the Bataan Peninsula. On December 25, 1941, he declared Manila to be an open city. On that same day, the Chief Engineer on the staff of the Commanding General addressed to each of the oil companies letters stating that the Pandacan oil depots "are requisitioned by the U. S. Army." The letters further stated: "Any action deemed necessary for the destruction of this property will be handled by the U. S. Army." An engineer in the employ of one of the com-

panies was commissioned a first lieutenant in the Army Corps of Engineers to facilitate this design.

On December 26, he received orders to prepare the facilities for demolition. On December 27, 1941, while enemy planes were bombing the area, this officer met with representatives of the companies. The orders of the Chief Engineer had been transmitted to the companies. Letters from the Deputy Chief of Staff, by command of General MacArthur, also had been sent to each of the oil companies, directing the destruction of all remaining petroleum products and the vital parts of the plants. Plans were laid to carry out these instructions, to expedite the removal of products which might still be of use to the troops in the field, and to lay a demolition network about the terminals. The representatives of Caltex were given, at their insistence, a penciled receipt for all the terminal facilities and stocks of Caltex.

At 5:40 p. m., December 31, 1941, while Japanese troops were entering Manila, Army personnel completed a successful demolition. All unused petroleum products were destroyed, and the facilities were rendered useless to the enemy. The enemy was deprived of a valuable logistic weapon.

After the war, respondents demanded compensation for all of the property which had been used or destroyed by the Army. The Government paid for the petroleum stocks and transportation equipment which were either used or destroyed by the Army, but it refused to compensate respondents for the destruction of the Pandacan terminal facilities. Claiming a constitutional right under the Fifth Amendment[1] to just compensation for these terminal facilities, respondents sued in the Court of Claims. Recovery was allowed. 120 Ct. Cl. 518, 100 F.

[1] ". . . nor shall private property be taken for public use, without just compensation."

Supp. 970. We granted certiorari to review this judgment. 343 U. S. 955.

As reflected in the findings of the Court of Claims, there were two rather distinct phases of Army operations in the Pandacan district in December 1941. While the military exercised considerable control over the business operations of respondents' terminals during the period between December 12 and December 26, there was not, according to the findings below, an assumption of actual physical or proprietary dominion over them during this period.[2] Bound by these findings, respondents do not now question the holding of the Court of Claims that prior to December 27 there was no seizure for which just compensation must be paid.

Accordingly, it is the legal significance of the events that occurred between December 27 and December 31 which concerns us. Respondents concede that the Army had a right to destroy the installations. But they insist that the destruction created a right in themselves to exact fair compensation from the United States for what was destroyed.

The argument draws heavily from statements by this Court in *Mitchell* v. *Harmony,* 13 How. 115 (1852), and *United States* v. *Russell,* 13 Wall. 623 (1871). We agree that the opinions lend some support to respondents' view.[3]

---

[2] At one point shortly after the outbreak of the war, the Army contemplated leasing respondents' facilities. But this plan was never put into effect. Respondents continued to operate the plants themselves up to December 26, 1941.

[3] In the *Russell* case, *supra,* the Court said, 13 Wall., at 627–628:

"Extraordinary and unforeseen occasions arise, however, beyond all doubt, in cases of extreme necessity in time of war or of immediate and impending public danger, in which private property may be impressed into the public service, or may be seized and appropriated to the public use, or may even be destroyed without the consent of the owner. . . . Exigencies of the kind do arise in time of war or

But the language in those two cases is far broader than the holdings. Both cases involved equipment which had been impressed by the Army for subsequent use by the Army. In neither was the Army's purpose limited, as it was in this case, to the sole objective of destroying property of strategic value to prevent the enemy from using it to wage war the more successfully.

A close reading of the *Mitchell* and *Russell* cases shows that they are not precedent to establish a compensable taking in this case. Nor do those cases exhaust all that has been said by this Court on the subject. In *United States* v. *Pacific R. Co.*, 120 U. S. 227 (1887), Mr. Justice Field, speaking for a unanimous Court, discussed the question at length. That case involved bridges which had been destroyed during the War Between the States by a retreating Northern Army to impede the advance of the Confederate Army.[4] Though the point was not directly involved, the Court raised the question of whether this act constituted a compensable taking by the United States and answered it in the negative:

> "The destruction or injury of private property in battle, or in the bombardment of cities and towns, and in many other ways in the war, had to be borne by the sufferers alone as one of its consequences. Whatever would embarrass or impede the advance

impending public danger, but it is the emergency, as was said by a great magistrate, that gives the right, and it is clear that the emergency must be shown to exist before the taking can be justified. Such a justification may be shown, and when shown the rule is well settled that the officer taking private property for such a purpose, if the emergency is fully proved, is not a trespasser, and that the government is bound to make full compensation to the owner."

[4] The narrow issue in the case was whether, after the Army rebuilt the bridges it had previously destroyed, the Army could charge for the expense of the rebuilding. On this issue the Court held for the railroad.

of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general. Indeed, it was his imperative duty to direct their destruction. The necessities of the war called for and justified this. The safety of the state in such cases overrides all considerations of private loss." [5]

It may be true that this language also went beyond the precise questions at issue. But the principles expressed were neither novel nor startling, for the common law had long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved.[6]   And what was said in the *Pacific Railroad* case was later made the basis for the holding in *Juragua Iron Co.* v. *United States,* 212 U. S. 297 (1909), where recovery was denied to the owners of a factory which had been destroyed by American soldiers in the field in Cuba because it was thought that the structure housed the germs of a contagious disease.

Therefore, whether or not the principle laid down by Mr. Justice Field was dictum when he enunciated it, we hold that it is law today. In our view, it must govern in this case. Respondents and the majority of the Court of Claims, arguing to the contrary, have placed great emphasis on the fact that the Army exercised "deliberation" in singling out this property, in "requisitioning" it from its owners, and in exercising "control" over it before devastating it.   We need not labor over these labels; it may be

---

[5] 120 U. S., at 234.

[6] For earlier cases expressing such principles see, *e. g., Bowditch* v. *Boston,* 101 U. S. 16, 18–19 (1879); *Respublica* v. *Sparhawk,* 1 Dall. 357 (1788); *Parham* v. *The Justices,* 9 Ga. 341, 348–349 (1851). See also 2 Kent's Commentaries (14th ed.) 338.

that they describe adequately what was done, but they do not show the legal consequences of what was done. The "requisition" involved in this case was no more than an order to evacuate the premises which were slated for demolition. The "deliberation" behind the order was no more than a design to prevent the enemy from realizing any strategic value from an area which he was soon to capture.

Had the Army hesitated, had the facilities only been destroyed after retreat, respondents would certainly have no claims to compensation. The Army did not hesitate. It is doubtful that any concern over the legal niceties of the situation entered into the decision to destroy the plants promptly while there was yet time to destroy them thoroughly.[7] Nor do we think it legally significant that the destruction was effected prior to withdrawal. The short of the matter is that this property, due to the fortunes of war, had become a potential weapon of great significance to the invader. It was destroyed, not appropriated for subsequent use. It was destroyed that the United States might better and sooner destroy the enemy.

The terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war. This Court has long recognized that in wartime many losses must be attributed solely to the fortunes of war,

---

[7] Cf. *Respublica* v. *Sparhawk, supra,* where the following appears, 1 Dall., at 363:

"We find, indeed, a memorable instance of folly recorded in the 3 *Vol. of Clarendon's History,* where it is mentioned, that the *Lord Mayor* of *London,* in 1666, when that city was on fire, would not give directions for, or consent to, the pulling down forty wooden houses, or to the removing the furniture, &c. belonging to the Lawyers of the Temple, then on the Circuit, for fear he should be answerable for a trespass; and in consequence of this conduct half that great city was burnt."

and not to the sovereign.[8]   No rigid rules can be laid down to distinguish compensable losses from noncompensable losses.   Each case must be judged on its own facts.   But the general principles laid down in the *Pacific Railroad* case seem especially applicable here.   Viewed realistically, then, the destruction of respondents' terminals by a trained team of engineers in the face of their impending seizure by the enemy was no different than the destruction of the bridges in the *Pacific Railroad* case.   Adhering to the principles of that case, we conclude that the court below erred in holding that respondents have a constitutional right to compensation on the claims presented to this Court.

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I have no doubt that the military had authority to select this particular property for destruction.   But whatever the weight of authority may be, I believe that the Fifth Amendment requires compensation for the taking.   The property was destroyed, not because it was in the nature of a public nuisance, but because its destruction was deemed necessary to help win the war.   It was as clearly appropriated to that end as animals, food, and supplies requisitioned for the defense effort.   As the Court says, the destruction of this property deprived the enemy of a valuable logistic weapon.

It seems to me that the guiding principle should be this: Whenever the Government determines that one person's property—whatever it may be—is essential to the war effort and appropriates it for the common good, the public purse, rather than the individual, should bear the loss.

---

[8] *Lichter* v. *United States*, 334 U. S. 742, 787–788 (1948); *Bowles* v. *Willingham*, 321 U. S. 503, 517–519 (1944); *Omnia Commercial Co.* v. *United States*, 261 U. S. 502 (1923).