**Firas Abdul Razzaq AL–QAISI, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 11–684C.**

United States Court of Federal Claims.

Feb. 22, 2012.

---

Firas Abdul Razzaq Al–Qaisi, pro se, Falls Church, Virginia.

David D'Alessandris, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Civil Division, and Jeanne A. Davidson, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Major Tyson McDonald, Litigation Attorney, U.S. Army Litigation Division, Fort Belvoir, Virginia.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiff Firas Abdul Razzaq Al–Qaisi, an Iraqi citizen now residing in the United States as an asylee, seeks millions of dollars in damages for events in Iraq in 2007. He alleges that U.S. forces in Iraq damaged his house, allowed him to be captured and mistreated by a brigade of the Iraqi National Police, and delayed his rescue by U.S. diplomatic personnel. The United States ("the government")[1] has moved to dismiss Mr. Al–

---

1. Mr. Al–Qaisi's complaint names as defendants the U.S. Department of the Army and the "American Military Forces in Iraq." Compl. at 1. The court has substituted the United States as the proper defendant. *See* Rule 10(a) of the Rules of the Court of Federal Claims ("RCFC"); *Gulden v. Department of the Army*, 228 Ct.Cl. 879, 881 (1981) ("[W]e ... will substitute the United States as the party defendant, although [the

Qaisi's complaint under RCFC 12(b)(1) and 12(b)(6).

## BACKGROUND[2]

Mr. Al–Qaisi, an attorney in his native Iraq before the outbreak of war, was a reliable advisor and informant to the U.S. Embassy in Baghdad. Compl. ¶ 8; see Compl. Ex. 1, ¶¶ 2, 6; Compl. Ex. 2, ¶ 2. On March 11, 2007, he told U.S. intelligence personnel about three recently planted roadside bombs. Mr. Al–Qaisi's information was ignored, and the bombs exploded when a U.S. military convoy passed, injuring several soldiers and killing one of them. Compl. ¶ 2; Compl. Ex. 4, ¶ 3. The series of events following this tragic incident were, Mr. Al–Qaisi alleges, attempts by the U.S. military to retaliate for its own failures. Compl. ¶¶ 3, 5; see also Pl.'s Reply Mem. to Support Pl.'s Compl. & Deny Def.'s Mot. to Dismiss ("Pl.'s Opp'n") at 4.

First, Mr. Al–Qaisi avers that on April 5, 2007 the U.S. shelled his home with "missile bombs." Compl. ¶¶ 3–4. Thereafter, on May 26, 2007, members of an Iraqi brigade, allegedly with the tacit consent of U.S. forces, arrested and jailed Mr. Al–Qaisi. Compl. ¶¶ 5–7; Compl. Ex. 1, ¶ 3. He alleges that during his incarceration for two weeks, Iraqi officials repeatedly mistreated him and deprived him of sleep, food, water, and medical care. Compl. ¶¶ 8–9; Compl. Ex. 6, at 6, 10–11, 15, 17–18. Mr. Al–Qaisi alleges that during this time U.S. military personnel "conceal[ed] the information of my detention from the database of the U.S. Government" to delay his rescue by diplomatic officials. Pl.'s Opp'n at 5; see also Compl. ¶ 45(G).

Mr. Al–Qaisi's complaint and appended materials are not, however, fully consistent. His submissions refer to a letter from the Mortars Division, U.S. Army Material Command, Picatinny Arsenal, which states that members of the Mortars Division examined photographs of the "missile bombs" that struck Mr. Al–Qaisi's home and found that they were unlike any U.S.-made field rounds. See Compl. Ex. 14, at 3. In addition, Mr. Al–Qaisi has provided two affidavits that contradict his assertion that the U.S. military concealed his detention from other U.S. authorities. The first affidavit is from Jennifer M. Fox, an employee of the U.S. Office of Hostage Affairs ("OHA"). It states that "[a]fter OHA learned that [Mr. Al–Qaisi] had been abducted on May 26, it took nearly four days for OHA to locate [him] through a [U.S. government] database that records detainee locations." Compl. Ex. 1, ¶ 6; see also Compl. Ex. 1, ¶ 4 ("Upon arrival [at the prison], U.S. military examined [Mr. Al–Qaisi] and filed severe abuse reports."); Compl. Ex. 1, ¶ 5 ("[T]he [U.S. government] requested that a military team visit [Mr. Al–Qaisi] to ensure he was not harmed. The military team reported back."). The second affidavit is from Warren Eric Barrus, a civilian special agent assigned to the Strategic Counterintelligence Directorate in Baghdad. It similarly states, "[a]fter conducting checks of databases of all detained persons in Baghdad, I was unable to locate him in the system. *Through liaison with U.S. military* ..., I learned that [Mr. Al–Qaisi] w[as] in fact in custody, but w[as] being moved around from station to station." Compl. Ex. 2, ¶ 5 (emphasis added).

Mr. Al–Qaisi was located by the U.S. government in early June 2007, and a U.S. military team made contact with him on June 5, 2007. Compl. Ex. 1, ¶ 5; see Pl.'s Opp'n at 15. Thereafter, on June 7, 2007, through "heroic efforts," Compl. Ex. 2, ¶ 5, a team of U.S. personnel and an Iraqi investigative judge released Mr. Al–Qaisi from prison. Compl. ¶ 10; Compl. Ex. 1, ¶ 8; see also Compl. Ex. 2, ¶ 5. Mr. Al–Qaisi was then transported to the International Zone in Baghdad where he received medical care and later applied for asylum. Compl. ¶ 11. The asylum applications of Mr. Al–Qaisi and his family were granted, and they arrived in the United States on August 24, 2007.

plaintiff's] papers do not meet all of the court's formal requirements.").

2. For purposes of resolving the government's motion to dismiss, the court presumes that the allegations contained in Mr. Al–Qaisi's complaint are true. The background presented here is provided solely to provide context and does not constitute findings of fact by the court.

Since his arrival, Mr. Al–Qaisi has brought several claims against the United States for the events in Iraq. A suit filed by Mr. Al–Qaisi in federal district court was dismissed for lack of jurisdiction, and the dismissal was affirmed on appeal. *See Al–Qaisi v. American Military Forces in Iraq,* No. 1:09–cv–01192 (E.D.Va. Apr. 22, 2010), *aff'd,* 390 Fed. Appx. 241 (4th Cir.2010). Similarly, an administrative claim filed by Mr. Al–Qaisi was denied by the U.S. Army Claims Service on February 2, 2011, and that denial was upheld upon reconsideration on March 15, 2011. Compl. Ex. 14, at 4–7.

## JURISDICTION

"Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action." *OTI Am., Inc. v. United States,* 68 Fed.Cl. 108, 113 (2005) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Mr. Al–Qaisi, "as the plaintiff, bears the burden of establishing the court's jurisdiction over [his] claims by a preponderance of the evidence." *Trusted Integration, Inc. v. United States,* 659 F.3d 1159, 1163 (Fed.Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir. 1988)). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995)). Disputed jurisdictional facts are subject to proof by a preponderance of the evidence. *See Nez Perce Tribe v. United States,* 83 Fed.Cl. 186, 188 (2008). Mr. Al–Qaisi's *pro se* pleadings are to be construed liberally in this regard, *see Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)), but liberality alone cannot relieve him of his burden to demonstrate that this court possesses jurisdiction. *See Kelley v. Secretary, U.S. Dep't of Labor,* 812 F.2d 1378, 1380 (Fed.Cir.1987).

The Tucker Act grants this court jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). "[B]ecause the Tucker Act itself does not create a substantive cause of action, in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.,* 525 F.3d 1299, 1306 (Fed.Cir. 2008) (internal quotation marks omitted) (quoting *Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (en banc in relevant part)). That is, a plaintiff must identify a legal provision that "can fairly be interpreted as mandating compensation by the [f]ederal [g]overnment for the damages sustained." *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (quoting *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)); *see also United States v. White Mountain Apache Tribe,* 537 U.S. 465, 473, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) ("While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." (citation omitted)).

## ANALYSIS

In essence, Mr. Al–Qaisi seeks redress for three events, each of which he avers was caused by the U.S. military: (1) the shelling of his house; (2) his arrest and detention by the Iraqi National Police; and (3) the concealment of his name in a U.S. government database to delay his rescue. Mr. Al–Qaisi argues that these acts were "preplanned and intentional crimes," Compl. ¶ 24, a "violation of the [c]ustomary [i]nternational [l]aw," Pl.'s Opp'n at 9, and "war crimes," *id. See also* Compl. ¶ 40 ("War [c]rimes [l]aw and [i]nternational [l]aw should also be applied."). "Thus," Mr. Al–Qaisi contends, "the United States Court of Federal Claims has the jurisdiction to entertain the complaint." Pl.'s Opp'n at 9.

The government responds that all of Mr. Al–Qaisi's claims sound in tort, which the

Tucker Act specifically withholds from this court's jurisdiction. Def.'s Mot. to Dismiss at 8. In addition, the government contends, Mr. Al–Qaisi has failed to identify a source of law mandating the payment of money damages as compensation for the government's alleged conduct. *Id.*[3]

■ Mr. Al–Qaisi's arrest by the Iraqi National Police, and its treatment of him in custody, raise issues that sound in tort. *See, e.g., Leitner v. United States,* 92 Fed.Cl. 220, 224 (2010) ("[F]alse imprisonment by government agents . . . is a tort." (citing *Schweitzer v. United States,* 82 Fed.Cl. 592, 595 (2008))). This is so even assuming that the U.S. military had anything to do with Mr. Al–Qaisi's arrest, incarceration, and temporary omission from the U.S. government's detainee database. *See Restatement (Second) of Torts* § 45A (1965) ("One who instigates or participates in the unlawful confinement of another is subject to liability to the other for [the tort of] false imprisonment."). The mistreatment experienced by Mr. Al–Qaisi while held in custody by the Iraqi National Police is encompassed by this determination. *See Smith v. United States,* 99 Fed.Cl. 581, 584 n. 3 (2011) ("Battery [and] assault . . . are torts." (citing *McCullough v. United States,* 76 Fed.Cl. 1, 4 (2006), *appeal dismissed,* 236 Fed.Appx. 615 (Fed.Cir.2007); *Burman v. United States,* 75 Fed.Cl. 727, 729 (2007))). Consequently, Mr. Al–Qaisi's claims based on these alleged actions of a tortious nature must be dismissed for lack of subject matter jurisdiction.

■ The shelling of Mr. Al–Qaisi's house arguably could be considered a Fifth Amendment taking rather than a tort. *See* Def.'s Mot. to Dismiss at 8. One dividing line between a taking and a tort is provided by the military-necessity doctrine, which precludes takings liability for property losses caused by the military in wartime. As explained in *Doe v. United States,* 95 Fed.Cl. 546 (2010), "compensable military takings under the Fifth Amendment occur when 'the military merely carries out the sovereign's eminent domain prerogative,' whereas when a military taking occurs pursuant to the exercise of the sovereign's 'war-making functions,' the sovereign is immune from liability and the claim is not cognizable under the Fifth Amendment." *Id.* at 566 (internal citation omitted) (quoting and citing *El–Shifa Pharm. Indus. Co. v. United States,* 378 F.3d 1346, 1356, 1359 (Fed.Cir. 2004)).

■ The facts of *Doe* are instructive. There, an Iraqi citizen brought a takings suit against the United States for the occupation and destruction of his house in 2004 during U.S.-led coalition operations in Fallujah, Iraq. *See Doe,* 95 Fed.Cl. at 551. After thoroughly analyzing the case law related to wartime takings, the court in *Doe* determined that the military-necessity doctrine extended to operations beyond direct combat, specifically ruling that the doctrine embraced "at least . . . an overall period of violent hostilities against Coalition Forces." *Id.* at 565. To conclude otherwise—that the destruction of the plaintiff's house during hostilities was an exercise of the government's civil eminent domain authority—would be "absurd in the extreme." *Id.* at 566. Consequently, the court held, "[t]he unfortunate loss of plaintiff's house is yet another addition to the long, sad catalog of wartime property losses that 'must be attributed solely to the fortunes of war, and not to the sovereign.'" *Id.* (quoting *United States v. Caltex (Philippines), Inc.,* 344 U.S. 149, 155–56, 73 S.Ct. 200, 97 L.Ed. 157 (1952)); *see also El–Shifa,*

---

3. The government also contends that the court lacks subject matter jurisdiction because of 28 U.S.C. § 2502, which provides:

Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction.

28 U.S.C. § 2502(a). Whether this reciprocity provision applies to bar Mr. Al–Qaisi's claims constitutes a difficult question which the parties have addressed only in a cursory way. Because the case may be resolved on other jurisdictional grounds, the court does not need to reach the reciprocity issue. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 431, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007) ("[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" (quoting *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 585, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999))).

378 F.3d at 1364 ("We cannot envision how a military commander ... could wage war successfully if he did not have the inherent power to decide what targets, *i.e.*, property, belonged to the enemy and could therefore be destroyed free from takings liability."). Similarly here, the damage to Mr. Al–Qaisi's property occurred during violent hostilities [4] and is thus non-compensable. Mr. Al–Qaisi's claim for damage to his house, then, must also be dismissed for lack of subject matter jurisdiction.[5]

 Mr. Al–Qaisi alternatively casts the events in Iraq as "preplanned and intentional crimes." Compl. ¶ 24. However, "[t]his court lacks jurisdiction to adjudicate criminal claims." *Hufford v. United States*, 87 Fed. Cl. 696, 702 (2009); *see also Joshua v. United States*, 17 F.3d 378, 379 (Fed.Cir.1994)

**4.** *See, e.g.*, Compl. ¶ 2 (recounting the explosion of a roadside bomb, which killed one U.S. soldier and injured others); Compl. ¶ 5 ("[T]he American military forces abundantly got into my neighborhood; they were accompanied by American military helicopters which were shooting at the adjacent farm yards."); Compl. Ex. 3, ¶ 4 (affidavit of Hussein Al–Qaisi, Mr. Al–Qaisi's brother) ("From time to time our neighborhood was bombed by Mehdi Army Militia.").

**5.** The government also suggests that Mr. Al–Qaisi lacks standing to bring a takings claim. A foreign national whose property is in a foreign country must demonstrate "significant connections" with the United States to have standing to sue. *Atamirzayeva v. United States*, 524 F.3d 1320, 1328 (Fed.Cir.2008). *Doe* is again instructive. The plaintiff there, similar to Mr. Al–Qaisi, was recruited by the United States to help during the war in Iraq, attended meetings with many different officers and embassy officials, and generally had "extensive voluntary contacts" with the United States. *Doe*, 95 Fed.Cl. at 575. Those contacts were held to be insufficient to provide a predicate for standing. *See id.* at 576; *see also United States v. Verdugo–Urquidez*, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (discussing whether an extradited Mexican citizen has standing to invoke Fourth Amendment rights regarding a search in Mexico). While Mr. Al–Qaisi has now resided in the United States for over four years, at the time of the shelling, Mr. Al–Qaisi was still present in Iraq and had contacts akin to those of the plaintiff in *Doe. See also Verdugo–Urquidez*, 494 U.S. at 272, 110 S.Ct. 1056 ("*When the search of his house in Mexico took place*, [respondent] had been present in the United States for only a matter of days." (emphasis added)); *id.* at 274–75, 110 S.Ct. 1056 ("*At the time of the search*, [respondent] was a citizen and resident of Mexi-

(same); *Kania v. United States*, 650 F.2d 264, 268 (Ct.Cl.1981).

 Finally, Mr. Al–Qaisi describes his claims as stemming from violations of customary international law. *See, e.g.*, Compl. ¶ 40. His claims, however, do not specify any particular aspect of such law that mandates money damages. As a result, these claims also must be dismissed for lack of subject matter jurisdiction. *See Phaidin v. United States*, 28 Fed.Cl. 231, 234 (1993) ("[T]he Tucker Act contains no language permitting this court to entertain jurisdiction over claims founded upon customary international law."); *see also Pikulin v. United States*, 97 Fed.Cl. 71, 77–78 (2011), *appeal dismissed*, 425 Fed.Appx. 902 (Fed.Cir.2011); *Zhao v. United States*, 91 Fed.Cl. 95, 100 n. 6 (2010).[6]

co with no voluntary attachment to the United States." (emphasis added)). *But cf. Doe*, 95 Fed. Cl. at 576 ("[T]o have standing ..., plaintiff must establish that he has come within the territory of the United States and developed substantial connections to this country, which he has not perfected."). Although a determination in this regard is unnecessary to decide the instant case, the court nonetheless notes that Mr. Al–Qaisi would have difficulty establishing his standing to bring a takings claim.

**6.** The violation of customary international law can provide a cause of action in federal court under rare circumstances. *See Sosa v. Alvarez–Machain*, 542 U.S. 692, 722–24, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (awarding the proceeds of an illegally captured prize when "sitting as the highest prize court of the United States, and administering the law of nations," *id.* at 714, 20 S.Ct. 290). However, such jurisdiction obtains only "[w]here there is no treaty, and no controlling executive *or legislative act* or judicial decision" to the contrary. *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C.Cir.1988) (quoting *The Paquete Habana*, 175 U.S. at 700, 20 S.Ct. 290); *see also Sampson v. Federal Republic of Germany*, 250 F.3d 1145, 1153 n. 4 (7th Cir. 2001) (addressing possible legal arguments for and against considering customary international law as part of federal common law after *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The Tucker Act is such a legislative act, and its waiver of sovereign immunity does not extend to claims based on violations of customary international law. *See Rosner v. United States*, 231 F.Supp.2d 1202, 1210–11 & n. 12 (S.D.Fla.2002) (resolving a case arising under the Little Tucker Act); *cf. El–Shifa Pharm.*

## CONCLUSION

The court does not have subject matter jurisdiction over Mr. Al–Qaisi's claims because they allege tortious or criminal conduct and violations of international law not remediable by money damages. Consequently, the government's motion to dismiss for lack of subject matter jurisdiction is GRANTED. The clerk shall enter judgment accordingly. No costs.

It is so ORDERED.

*Indus. Co. v. United States,* 607 F.3d 836, 858 (D.C.Cir.2010) (en banc) (Kavanaugh, J., concurring in the judgment) ("The Alien Tort Statute has never been held to cover suits against the United States or United States [g]overnment officials; the statute furnishes no waiver of sovereign immunity.").