786 P.2d 524

Joe MARTY and Ella M. Marty, husband and wife, Carl W. Lundholm and Gladys I. Lundholm, husband and wife, Keith Rady and Deanna Rady, husband and wife, Paul Gunderson and Deoine Gunderson, husband and wife, Duane Lundholm and Ramona Lundholm, husband and wife, Plaintiffs–Appellants,

v.

STATE of Idaho, a body politic; Flood Control District 5; Walter Speelmon; Water District 31; Donald Shenton; Garth Soderquist; Holley Water Users Association, a forfeited Idaho corporation, by and through its statutory trustees Lamoyne Barney, Rex Coleman, and J. Kay Byrne; Jackett Canal Company, an Idaho corporation; Level Canal Company, a forfeited Idaho corporation by and through its statutory trustees, Werner Schmitt, and Frank Siddoway; Owsley Canal Company, an Idaho corporation; Independent Water Users of Mud Lake, Inc., an Idaho corporation; Jay Furniss; Art Dobson; Joe Potter; John Doe Corporations I Through X; John Does I Through XX, Defendants–Respondents,

and

Lewis Bezold; Jefferson County, a political subdivision of the state of Idaho, Defendants.

No. 17733.

Supreme Court of Idaho.

Dec. 21, 1989.

Rehearing Denied Feb. 23, 1990.

Ling, Nielsen & Robinson, Rupert, for plaintiffs-appellants. Mark A. Ingram, argued.

Jim Jones, Atty. Gen., Boise, Curt R. Thomsen, Sp. Deputy Atty. Gen., argued, Idaho Falls, for the State.

Holden, Kidwell, Hahn & Crapo, Idaho Falls, for defendants-respondents, Water District # 31, Flood Control District # 5, Level Canal Co., Schmitt, Siddoway, Furniss, Potter, Shenton, Soderquist, and Speelmon. Curt R. Thomsen, argued.

Anderson, Pike and Bush, Idaho Falls, for defendant-respondent, Art Dobson, Douglas R. Nelson, appeared.

Racine, Olson, Nye, Cooper and Budge, Pocatello, for defendant-respondent Jacket Canal Co. William D. Olson, appeared.

Imhoff and Lynch, Idaho Falls, for defendant-respondent Owsley Canal Co. Stephen McGrath, appeared.

St. Clair, Hiller, Wood and St. Clair, Idaho Falls, for defendants-respondents, Holley Water Users, Lamayne, Coleman and Byrne. Richard T. St. Clair, appeared.

JOHNSON, Justice.

This is a flood liability case. It involves the flooding of farmland near Mud Lake in 1984 and 1985. The owners of this farmland (the landowners) sued various governmental agencies, officers and employees (the governmental agencies) and local canal companies (the canal companies) and water users (the water users) seeking damages and injunctive relief. The issues we address in this opinion are (1) whether the governmental agencies were immune from liability, (2) whether the landowners were entitled to pursue their claim for inverse condemnation, (3) whether the canal companies and the water users breached a duty they owed to the landowners to prevent the flooding and (4) whether the landowners were entitled to an injunction. We affirm the summary judgments as to the immunity of the governmental agencies, as to the lack of any breach of duty by the canal companies and the water users and as to the denial of an injunction. We reverse and remand as to the summary judgment

granted against the landowners on their claim for inverse condemnation.

## I.

## THE BACKGROUND AND PRIOR PROCEEDINGS.

The Mud Lake area is a terminal basin without a natural drainage outlet, comprised of the presently diked area of Mud Lake and adjacent low-lying farmlands. In the 1920's the early settlers began diking the lake in order to reclaim productive agricultural lands from the marshes and to provide storage for irrigation. Prior to the diking of Mud Lake, the lands now owned by the landowners had been subjected to periodic flooding because they were located in a 100–year flood plain. The area involved in this case and some of the pertinent features are portrayed in the following map:

On June 3, 1983, the board of commissioners of Jefferson County declared the area surrounding Mud Lake to be a flood emergency area and requested assistance from the governor of the State of Idaho. On June 6, 1983, the governor declared the existence of a state of extreme emergency because "excessive runoff and spring rains have seriously weakened the Mud Lake dikes" and the failure of these dikes would result in "serious flooding to approximately forty residents and several thousand acres of land" and "endanger the lives and property of the citizens of Terreton." All agen-

cies of state government were required by the proclamation "to take action ... to arrest or alleviate the conditions perpetuating the state of extreme emergency."

Unusually heavy rainfall in the spring of 1984 combined with the already saturated water table from 1983 to create a flow into the Mud Lake water system that had not occurred since 1923.

In a combined effort the governmental agencies, the Army Corps of Engineers, the canal companies, the water users and numerous volunteers responded to the impending flood. The Idaho Department of Water Resources (IDWR) coordinated this effort. Action was taken to: (1) strengthen and increase the height of the Mud Lake dike, which encloses the lake on the south, southeast and southwest; (2) divert excess water from Mud Lake through the use of the Owsley Canal Co. pump station; (3) divert water from Camas Creek at the Lone Tree structure; (4) cap all artesian wells that flow into the lake; (5) retain inflow from Camas Creek and flood waters at the wildlife refuge behind the Bybee structure; and (6) cut the Dobson ditch to relieve the pressure on the Bybee structure.

On June 12, 1984, the board of commissioners of Jefferson County declared the existence of a state of emergency because of the flooding of land adjacent to Mud Lake, including that of the landowners. The governor of the state of Idaho did the same on June 14, 1984.

Flooding of the farmland of the landowners commenced in April 1984. Water remained standing on these lands throughout the year. Similar flooding occurred in 1985.

In late 1985 the landowners filed suit seeking damages and injunctive relief against the governmental agencies, the canal companies and the water users. The landowners based their claims for damages on theories of trespass, strict liability, negligence and inverse condemnation. They alleged that their farmland had been flooded as a result of the actions and decisions of the governmental agencies, the canal companies and the water users, including the failure to construct a spillway to prevent the flooding of the landowners' farmland.

The governmental agencies, the canal companies and the water users moved for summary judgment, denying that there was any basis for liability under the theories advanced by the landowners and that their actions and decisions were immunized under several Idaho statutes. The trial court granted summary judgment dismissing all of the claims of the landowners. The landowners appealed.

## II.

### WERE THE GOVERNMENTAL AGENCIES IMMUNIZED UNDER I.C. § 42–1717?

■ The governmental agencies assert that they were immunized from liability to the landowners under I.C. § 42–1717. The trial court agreed. We agree that all of the governmental agencies except the flood control district are immunized in this case under I.C. § 42–1717.[1] By the terms of this statute the State of Idaho, IDWR and

---

1. As it existed at times pertinent to this case, I.C. § 42–1717 provided:

    **42–1717. JURISDICTION OVER SUPERVISION OF MAINTENANCE, OPERATION AND INSPECTION OF DAMS AND MINE TAILINGS IMPOUNDMENT STRUCTURES.** Supervision over the maintenance and operation of dams, reservoirs and mine tailings impoundment structures insofar as necessary to safeguard life and property from injury by reason of the failure thereof is vested in the director of the department of water resources. The director shall at state expense inspect or cause to be inspected, as often as he thinks advisable, every dam used for holding water

    and mine tailings impoundment structure used for holding tailings slurry in this state; however, all dams twenty (20) feet or more in height or mine tailings impoundment structures more than thirty (30) feet in height shall be inspected at least once every two (2) years, and if after any such inspection such dam or mine tailings impoundment structure, in the opinion of the director, is unsafe, and life or property liable to be endangered by reason thereof, the director shall give written notice and order by certified mail or by personal service upon the owner or owners to remove or repair the same so as to make it safe. If such owner or owners shall neglect or refuse

their agents or employees are given immunity from damages caused through measures taken to control and regulate a dam or to protect against failure of any dam during an emergency.

The Mud Lake dike is a "dam" as defined in I.C. § 42–1711(b), since it has an impoundment capacity of more than fifty acre feet.

All of the actions or decisions of IDWR that are alleged to have contributed to the flooding in 1984 and 1985 can be characterized as measures taken to control and regulate the dike or to protect against failure of the dike during an emergency.

For the purpose of ruling on the motions for summary judgment, the trial court assumed that some of the flooding of the landowners' land resulted from the lack of any system for drainage of an inflow of water into Mud Lake in excess of its capacity. A 1981 report of a safety inspection of the Mud Lake dike conducted by IDWR concluded that the dike did not contain a low level outlet nor a spillway capable of passing or storing the 100–year flood with freeboard required by the state's rules for new dam construction. The report noted that due to the character of the dike and downstream conditions, a low level outlet

to remove or repair the same after notice to that effect has been given in writing by the director, the director may draw off all or part of such water from behind such dam, embankment or mine tailings slurry from behind mine tailings impoundment structure and keep said water or mine tailings slurry drawn off until such time as the orders shall be complied with. In determining whether or not a dam, reservoir or mine tailings impoundment structure constitutes or would constitute a danger to life or property, the director shall take into consideration the possibility that the dam, reservoir or mine tailings impoundment structure might be endangered by overtopping, seepage, settlement, erosion, cracking, earth movement or other conditions which exist or might occur in any area in the vicinity of the dam, reservoir or mine tailings impoundment structure.

No action shall be brought against the state, the director, or the department or its agents or employees for the recovery of damages caused by the partial or total failure of any dam, reservoir or mine tailings impoundment structure or through the operation of any dam, reservoir or mine tailings impoundment structure upon the ground that such defendant is liable by virtue of any of the following:

(a) The approval of the dam, reservoir or mine tailings impoundment structure.

(b) The issuance or enforcement of orders relative to maintenance or operation of the dam, reservoir or mine tailings impoundment structure.

(c) Control and regulation of the dam, reservoir or mine tailings impoundment structure.

(d) Measures taken to protect against failure during an emergency.

(e) The use of design and construction criteria prepared by the department.

No action shall be brought by the state against the owner for pollution which may occur in the event that the director orders emergency dumping or bypassing.

Nothing in this part shall be construed to relieve an owner or operator of a dam, reservoir or mine tailings impoundment structure of the legal duties, obligations or liabilities incident to the ownership or operation of the dam, reservoir or mine tailings impoundment structure.

The findings and orders of the director and the certificate of approval of any dam, reservoir or mine tailings impoundment structure issued by the director are final and conclusive and binding upon all state agencies, regulatory or otherwise, as to the safety of design, construction, maintenance and operation of any dam, reservoir or mine tailings impoundment structure.

The director may require owners to keep records of, and to report on, maintenance, operation, staffing and engineering and geologic investigations, and the water resource board shall issue such rules and regulations as necessary to secure maintenance and operation and to require staffing and engineering and geologic investigations which will safeguard life and property. In addition, the owner of a dam, reservoir or mine tailings impoundment structure or his agent shall fully and promptly advise the department of any sudden or unprecedented flood or unusual or alarming circumstance or occurrence affecting the safety of the dam, reservoir or mine tailings impoundment structure. The director, from time to time, shall make inspections of dams, reservoirs and mine tailings impoundment structures at state expense for the purpose of determining their safety, but shall require owners to perform at their expense such work as necessary to disclose information sufficient to enable the director to determine conditions of dams, reservoirs, and mine tailings impoundment structures in regard to their safety and to perform at their expense other work necessary to secure maintenance and operation which will safeguard life and property.

or a spillway might not be warranted. The report recommended a study to determine where either could be provided. Early in 1984 IDWR in conjunction with Flood Control District No. 5 evaluated the practicality of relying on a spillway to control the level of Mud Lake. IDWR concluded that due to the lack of adequate ponding areas around the lake, a spillway would not have much value.

I.C. § 42–1717 does not require existing dams to comply with the rules for new dams. It requires inspection of dams by the director of IDWR or at his direction. The statute specifies that if the director concludes that a dam is unsafe, the director may order the dam removed or repaired. If the owner of the dam does not remove or repair it, the director may draw off the water from behind the dam.

Here, following the 1981 inspection, the director did not conclude that the Mud Lake dike was unsafe because of the lack of a spillway or low level outlet. Therefore, there was no occasion for the director to order the dike to be removed or repaired. Whether a spillway or a low level outlet was necessary for the safety of the dike was a decision the legislature left to the judgment of the director. There was no mandatory requirement that either a spillway or a low level outlet be installed in an existing dam, only that new dams were required to have them. This was made clear by the rules and regulations of IDWR concerning the safety of dams. As they existed in 1984 and 1985, they provided: "The design requirements listed are intended as a guide to establish acceptable standards for construction." IDAPA 37.G.1,2,-1. In 1988 the rules and regulations were amended to apply the design requirements to certain existing dams.

The state is immunized under I.C. § 42–1717(c) for any decision of the director in controlling and regulating the Mud Lake dike, including the decision that the dike was not unsafe because it did not have a spillway or a low level outlet.

The strengthening and increasing the height of the dike, the diversions of water, the capping of wells, retaining inflow and cutting the Dobson ditch all are measures taken to protect against failure of a dam. The state is immunized as to these actions under I.C. § 42–1717(d).

█ We must then address whether the immunity accorded to the state under I.C. § 42–1717 extends to the flood control district and its chairman and to the water district and its watermaster and chairman.

I.C. § 42–1717 grants immunity to the agents or employees of the state and IDWR. Are the flood control district and its chairman and the water district and its water master and chairman agents or employees of the state or IDWR?

Flood control districts may be organized upon petition of one-third or more of the qualified electors residing in the proposed district and upon an order of the director of IDWR. I.C. §§ 42–3105 and 42–3108. The director of IDWR also appoints the directors of the flood control district. I.C. § 42–3109. If the flood control district wishes to use a natural stream for a flood control structure, the director of IDWR must approve the alteration of the stream. I.C. § 42–3115(14). The board of commissioners of flood control districts have the power to enter into agreements or contracts with the State of Idaho or any of its agencies to take over, administer and maintain flood control projects. I.C. § 42–3115(17). The director of IDWR may dissolve a flood control district by filing a complaint in the district court for the county in which the office of the district was last located. I.C. § 42–3126.

IDWR has the duty to direct and control the distribution of water from all of the streams in the state to the canals and ditches which divert water from them. I.C. § 42–602. To fulfill this duty IDWR is authorized to create water districts throughout the state. I.C. § 42–604. If the owners or users of water rights in the district do not elect a watermaster or fix compensation for the watermaster, IDWR is authorized to appoint the watermaster and fix the compensation for the watermaster. I.C. § 42–605(6). IDWR may remove a watermaster if the watermaster fails to perform the duty of watermaster. I.C.

§ 42–605(7). The watermaster must take an oath to perform the duties of the office of watermaster, and this oath shall be filed with IDWR. I.C. § 42–605(8). Upon appointment by the director of IDWR, the actions taken by a watermaster in fulfillment of the duties of the office are covered by the state group surety bond as provided by I.C. §§ 59–801 through 59–804. *Id.*

On January 31, 1984, representatives of IDWR met with the chairman of the flood control district and the watermaster of the water district, together with representatives of the canal companies, the water users, the Army Corps of Engineers and other concerned parties to discuss the status of Mud Lake. In this meeting it was agreed that IDWR would assist the flood control district, the watermaster and other local groups, if the lake level created a problem that spring. Contingency plans were discussed, including flow diversions, ponding areas and wasting facilities such as channels and wells.

On March 16, 1984, the administrator of the resources administration division of IDWR wrote to the chairman of the flood control district with a copy to the watermaster of the water district. The letter directed the flood control district and the water district to start pumping excess storage water in mid-March for wasting in a sink area southwest of Mud Lake. The letter noted that the districts and IDWR "must continue monitoring snow course data and anticipate stream flow quantities, which will add to (and could aggravate) the Lake content." The chairman of the flood control district was directed to advise IDWR how much flow was entering the lake and to record the quantities of water wasted and to note how much draw down was achieved by wasting. The letter stated that unless the April 1 projections indicated otherwise, the districts would need to evacuate approximately 12,000 acre feet during March and April. It also stated that the flood control district was responsible for developing and deploying local resources for flood control activities. The letter concluded:

In summary, the primary responsibility for flood control remains with the local authorities. The Corps and the State will provide assistance, in accordance with their authority, to supplement the capability of the local agencies.

In addition to withdrawing water from the Lake, we trust you will detain some inflow from Camas Creek at the Bybee structure. The Department will evaluate the structural adequacy of the embankment (and outlets) to determine its reliability, then advise you. If upstream detention and pumping to waste are not affecting sufficient control of the situation, the Districts may need to breach the Lake into the ponding area (Joe Marty's property). Aside from this ponding area, there appears to be little, if any, advantage to installing a spillway, as our March 9, 1984 letter indicates.

Please also note, the Department supports your request for a long-term study of solutions to prevent overfilling of Mud Lake in future years.

In conclusion, the Districts should advise us when pumping to waste will start, then advise us weekly about progress in drawing the Lake down.

On April 9, 1984, the administrator of the resources administration division of IDWR again wrote to the chairman of the flood control district with a copy to the watermaster. In this letter IDWR stated that the districts "must continue to exercise every option available to divert inflow and withdraw water from the lake so there is space for runoff." The letter noted that because stream flow would be above normal, "the storage level must be kept drawn down by pumping during April and May to provide space for inflow from Camas Creek." The letter concluded:

We request the Lone Tree Diversion be examined to ascertain whether it is functioning, as soon as possible. Hopefully, the Bybee structure will not be used to detain additional water, until on or after May 1st. The District must continue monitoring inflow and the status of the Lake level. Please have Mr. Don Shenton, watermaster, confirm whether upstream diversions have filled the spaces

available on the Wildlife Refuge and measure the flows entering the Lake. As soon as the Department has completed evaluating the Bybee Structure, we will advise you.

If the Districts have difficulty meeting the objective (holding the Lake level to G.H. 8.5 feet) or if there are any questions, please advise us immediately.

The statutory relationship between the districts and IDWR and the directions given to the districts by IDWR concerning the management of the impending flood conditions at Mud Lake indicate to us that the flood control district, its chairman, the water district, its chairman and the watermaster were agents of IDWR in taking the actions and making the decisions that form the basis for the claims of the landowners against these parties.

The landowners do not dispute that the districts, their chairmen and the watermaster were agents of IDWR. They do assert that the immunity granted to agents of IDWR does not extend to these parties, because the districts are owners and operators of the Mud Lake dike and fall within the exclusion to the immunity provisions of I.C. § 42–1717:

> Nothing in this part shall be construed to relieve an owner or operator of a dam, reservoir or mine tailings impoundment structure of the legal duties, obligations or liabilities incident to the ownership or operation of the dam, reservoir or mine tailings impoundment structure.

I.C. § 42–1711(d) defines "owner" to include any agency or political subdivision of the State of Idaho that controls, operates, maintains or manages a dam or reservoir. The landowners contend that the districts control, operate, maintain and manage the Mud Lake dike and are therefore owners of the dike as referred to in I.C. § 42–1717.

The 1981 inspection report of IDWR indicates that in 1980 the flood control district assumed control to improve the Mud Lake dike. Construing this and the other material submitted in connection with the motions for summary judgment liberally in favor of the landowners, there is sufficient indication of the flood control district's control of the dike to prevent the application of I.C. § 42–1717 to immunize the flood control district in this case. However, there is no evidence that the chairman of the flood control district had any personal control over the dike. Therefore, to the extent that the chairman might have any responsibility for the flooding of the landowners' land, the chairman is entitled to immunity under I.C. § 42–1717.

The same analysis leads us to the conclusion that the water district, its chairman and the water master are also entitled to immunity. Even construing the material submitted in connection with the motions for summary judgment liberally in favor of the landowners, there is no genuine issue as to whether the water district and the watermaster were owners or operators of the Mud Lake dike. While they were involved in the planning and activity to avoid the failure of the dike, there is no evidence that they owned, controlled, operated, maintained or managed the dike. Therefore, as agents of IDWR they were immunized under I.C. § 42–1717.

### III.

### DID THE FLOOD CONTROL DISTRICT HAVE IMMUNITY UNDER I.C. § 6–904(1)?

The trial court also granted summary judgment to the flood control district under I.C. § 6–904(1) on the basis that any negligence of the district that may have contributed to the flooding of the landowners' property constituted planning and was therefore discretionary. We agree.

The first step in our analysis of this issue is to determine whether the landowners generally stated a cause of action against the flood control district for which "a private person or entity would be liable for money damages under the laws of the state of Idaho." *Walker v. Shoshone County,* 112 Idaho 991, 995, 739 P.2d 290, 294 (1987). The landowners have advanced several theories upon which they predicate the liability of the flood control district. The trial court rejected the claims based on trespass and strict liability, but ruled that

the landowners had stated a claim against the flood control district based on negligence. We conclude that it is unnecessary for us to determine whether the trial court was correct in rejecting the claims based on trespass and strict liability, since we concur with the trial court that the landowners stated a negligence claim against the flood control district. Whether the flood control district might have been liable for trespass or strictly liable would not require a different analysis concerning the immunity granted under I.C. § 6–904(1) than that we must apply in determining this issue with regard to the negligence claim.

We must then decide whether the trial court correctly determined, as a matter of law, that an exception to liability is found in I.C. § 6–904(1). *Czaplicki v. Gooding Joint School Dist. No. 231*, 116 Idaho 326, 330, 775 P.2d 640, 644 (1989). In interpreting the discretionary function exception to governmental liability contained in I.C. § 6–904(1), this Court has established the rule that a governmental entity and its employees are immune from liability for planning activities or policy formation. *Sterling v. Bloom*, 111 Idaho 211, 226–233, 723 P.2d 755, 770–77 (1986). In applying this rule we have said:

Determining the applicability of the discretionary function exception is a two-step process. First, one must examine the nature and quality of the challenged actions. Routine, everyday matters not requiring evaluation of broad policy factors will more likely than not be "operational." Decisions and actions which involve a consideration of the financial, political, economic and social effects of a given plan or policy will generally be "planning" and fall within the discretionary function exception....

Second, the policies underlying the discretionary function exception must be considered. The policies are twofold: (1) to permit those who govern to do so without being unduly inhibited in the performance of that function by the threat of liability for tortious conduct; and (2) to limit judicial re-examination of basic policy decisions properly entrusted to other branches of government.

*Ransom v. City of Garden City*, 113 Idaho 202, 205, 743 P.2d 70, 73 (1987). (citations omitted).

Applying these principles to the claim against the flood control district leads us to the conclusion that the actions of the district about which the landowners complain were correctly characterized by the trial court as "planning" and fall within the discretionary function exception of I.C. § 6–904(1). The landowners assert that the activities of the flood control district upon which they seek to predicate their case include (1) the shoring up of the Mud Lake dikes, (2) the diversion of waters from the Bybee structure and (3) the failure to account for incoming flood water which had been previously diverted into the Mud Lake water system's upstream diversions.

Of these activities, we have no difficulty in characterizing the first two as "planning" rather than "operational." These were not routine, everyday matters, but rather decisions and actions that involved their financial, political, economic and social effects. The fact that they were planned and carried out in conjunction with IDWR and other entities and individuals is a further indication that they were not operational. To allow judicial re-examination of these decisions and actions would invade the authority properly entrusted to the flood control district.

The third activity of the flood control district upon which the landowners predicate liability—the failure to account for incoming flood water which had previously diverted into the Mud Lake water system's upstream diversions—is more difficult to categorize. The implication of this allegation is that this failure was not the result of any planning or policy decision of the district, but rather was simply negligence not requiring the exercise of broad policy factors. However, in the context of the plan that was developed by the flood control district through the direction of IDWR to control the build up of flood waters in the Mud Lake water system, this purported failure was not simply a negligent operational act. It was part and par-

cel of the plan to attempt to divert water out of the system. The fact that this water reentered the system merely indicates that the plan may have been imperfect. This is just the type of negligence that I.C. § 6–904(1) was designed to immunize.

## IV.

## WERE THE LANDOWNERS ENTITLED TO PURSUE THEIR CLAIM FOR INVERSE CONDEMNATION?

■ As an alternative theory, the landowners assert a claim for inverse condemnation. In this claim they alleged that they were entitled to just compensation for the taking of their land. The trial court rejected this theory on the basis that the landowners did not exhaust their administrative remedy to obtain compensation under I.C. § 46–1012. We disagree with the trial court's ruling.

The statute invoked by the trial court provides a means for obtaining compensation for property that "was commandeered or otherwise used in coping with a disaster emergency and its use or destruction was ordered by the governor or his representative." I.C. § 46–1012(3). Claims for compensation must be filed with the bureau of disaster services. I.C. § 46–1012(4). The trial court ruled that the landowners could not pursue their inverse condemnation claim, because they did not exhaust the administrative remedy given to them in this statute. However, the statute does not provide for compensation unless the use or destruction of the property was ordered by the governor or his representative. The declaration of a state of emergency by the governor on June 14, 1984, did not refer to the use or destruction of the landowners' property. Neither IDWR nor any of the other governmental agencies is properly characterized as the "representative" of the governor in responding to the emergency. There is no evidence here that the governor designated any of the governmental agencies as his representative. Therefore, we hold that the landowners were not required to exhaust the remedy provided by I.C. § 46–1012, since that statute did not

provide them with a remedy under the circumstances here.

■ As an alternative grounds for upholding the trial court's decision rejecting the landowners' inverse condemnation claim, the governmental agencies invoke the doctrine of public necessity contained in Restatement (Second) of Torts § 196 (1965). The thrust of this doctrine is that "[o]ne is privileged to enter land in the possession of another if it is, or if the actor reasonably believes it to be, necessary for the purpose of averting an imminent public disaster." *Id.* The governmental agencies point out that a comment to the Restatement states that the privilege carries with it the privilege to do "any other acts on the premises reasonably necessary to effectuate the purpose for which the privilege exists." *Id.* at comment (f).

The governmental agencies acknowledge that this Court has not previously adopted the doctrine of public necessity. They cite decisions from our sister states of Washington and Colorado as demonstrating the application of the doctrine. *Short v. Pierce County,* 194 Wash. 421, 78 P.2d 610 (1938); *Srb v. Board of County Commissioners,* 43 Colo.App. 14, 601 P.2d 1082 (1979), *cert. denied,* 199 Colo. 496, 618 P.2d 1105 (1980). In *Srb* the court held that "when property is taken by the state or one of its political subdivisions under circumstances of imminent necessity, the failure justly to compensate the owner does not violate" the just compensation provision of the Colorado constitution. 601 P.2d at 1085.

Since 1864 the statutes of Idaho, first as a territory and then as a state, have declared:

The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution or laws of the United States, in all cases not provided for in these compiled laws, is the rule of decision in all courts of this state.

I.C. § 73–116.

The doctrine of public necessity was the common law of England. 2 Kent's Commentaries (14th ed. 1896) 339, n.(a). In 1853 the Supreme Court of California recognized the existence of the doctrine:

The right to destroy property, to prevent the spread of a conflagration, has been traced to the highest law of necessity, and the natural rights of man, independent of society or civil government. "It is referred by moralists and jurists to the same great principle which justifies the exclusive appropriation of a plank in a shipwreck, though the life of another be sacrificed; with the throwing overboard goods in a tempest, for the safety of a vessel; with the trespassing upon the lands of another, to escape death by an enemy. It rests upon the maxim, *Necessitas inducit privilegium quod jura privata.*"

The common law adopts the principles of the natural law, and places the justification of an act otherwise tortious precisely on the same ground of necessity. (See *American Print Works v. Lawrence,* 1 Zab. 258, 264, and the cases there cited.)

This principle has been familiarly recognized by the books from the time of the saltpetre case, and the instances of tearing down houses to prevent a conflagration, or to raise bulwarks for the defence of a city, are made use of as illustrations, rather than as abstract cases, in which its exercise is permitted. At such times, the individual rights of property give way to the higher laws of impending necessity.

*Surocco v. Geary,* 3 Cal. 69, 73 (1853).

The United States Supreme Court also has stated:

[T]he common law had long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved.

*United States v. Caltex, Inc.,* 344 U.S. 149, 154, 73 S.Ct. 200, 202, 97 L.Ed. 157, 162 (1952), *reh'g denied,* 344 U.S. 919, 73 S.Ct. 345, 97 L.Ed. 708 (1953).

These authorities convince us that although this Court has never before had the occasion to recognize the existence of the doctrine of public necessity, it was part of the common law of England. As we said in 1922 regarding another common law doctrine—the right of distress *damage feasant*—the doctrine "is applicable to this state in so far as it is not repugnant to or inconsistent with our constitution and laws." *Kelly v. Easton,* 35 Idaho 340, 343, 207 P. 129 (1922).

Recently, the United States District Court for the District of Idaho acknowledged the doctrine of public necessity, but stated that Idaho has abrogated the doctrine by adopting the State Disaster Preparedness Act, I.C. § 46–1001, *et seq. Union Pac. R.R. v. State of Idaho,* 654 F.Supp. 1236, 1243, *modified on other grounds,* 663 F.Supp. 75 (D.Idaho 1987). In reaching this conclusion the federal district court relied on comment (g) to Restatement (Second) of Torts § 196 (1965). This comment states:

g. In many States statutes have been enacted designating certain public officials as authorized to determine the necessity for and to order the destruction of buildings in the path of a conflagration. Usually these statutes merely prescribe a condition upon which the statutory right to recover compensation from the organized community is dependent. A statute may, however, confer on specified public officials the exclusive authority to act in such matters. By such a statute, the privilege stated in this Subsection is abrogated.

We agree with the federal court that by enacting the State Disaster Preparedness Act (the Act), the legislature abrogated the common law doctrine of public necessity.

The Act defines "disaster" to mean

occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural or man made cause, including but not limited to fire, flood, earthquake, windstorm, wave action, volcanic activity, explosion, riot, or hostile military or paramilitary action.

I.C. § 46–1002(3). The Act grants to the governor and to mayors and chairpersons of county commissions the authority to declare emergencies. I.C. § 46–1011(1). I.C.

§ 46–1017 [2] also grants immunity from liability for death, injury or damage resulting from activity conducted pursuant to the Act. This statute indicates to us that the legislature intended to codify a version of the doctrine of public necessity. It is then the Act and not the doctrine of public necessity that must be considered to determine whether the landowners are entitled to pursue their claim for inverse condemnation.

■ Whether the landowners are entitled to compensation for inverse condemnation will first depend on whether their property was permanently damaged. *Turcotte v. State*, 84 Idaho 451, 455–456, 373 P.2d 569, 571–72 (1962). What is permanent damage for recovery for inverse condemnation under our state constitution may depend on the probability of future flooding. *Shaw v. City of Rupert*, 106 Idaho 526, 528, 681 P.2d 1001, 1003 (1984). Under the fifth and fourteenth amendments to the United States Constitution whether the damage is permanent may depend on proof of frequent and inevitably recurring inundation due to governmental action. *Pinkham v. Lewiston Orchards Irrigation Dist.*, 862 F.2d 184, 189 n. 5 (9th Cir. 1988).

In the event permanent damage is shown by the landowners, the immunity provisions of I.C. § 46–1017 must be applied. This immunity exists only when the state, its political subdivisions or other agencies were "acting under a declaration by proper authority." Here, the board of county commissioners did not declare an emergency until June 12, 1984. The governor declared an emergency on June 14, 1984. The emergency declared by the county commissioners was for a period of seven

days. I.C. § 46–1011(1). The emergency declared by the governor was for thirty days, unless extended by further declaration. I.C. § 46–1008(2). Whether the actions of the governmental agencies were immunized by I.C. § 46–1017 will depend on whether they were taken during these periods.

These questions should be resolved by the trial court. We reverse and remand for this purpose.

## V.

## THE CANAL COMPANIES AND THE WATER USERS BREACHED NO DUTY TO THE LANDOWNERS.

■ The landowners predicate the liability of the canal companies and the water users on their breach of the duty imposed upon them by I.C. § 42–1204. This statute provides:

42–1204. **Prevention of damage to others.**—The owners or constructors of ditches, canals, works or other aqueducts, and their successors in interest, using and employing the same to convey the waters of any stream or spring, whether the said ditches, canals, works or aqueducts be upon the lands owned or claimed by them, or upon other lands, must carefully keep and maintain the same, and the embankments, flumes or other conduits, by which such waters are or may be conducted, in good repair and condition, so as not to damage or in any way injure the property or premises of others.

The landowners assert that the canal companies and the water users breached their duty under this statute by authorizing the

2. **46–1017. Immunity.**—Neither the state nor any political subdivision thereof nor other agencies, nor, except in cases of wilful misconduct, the agents, employees or representatives of any of them engaged in any civil defense or disaster relief activities, acting under a declaration by proper authority nor, except in cases of wilful misconduct or gross negligence, any person, firm corporation or entity under contract with them to provide equipment or work on a cost basis to be used in disaster relief, while complying with or attempting to comply with this act or any rule or regulation promulgated pursuant to the provisions of the act, shall be liable for the death of or any injury to persons or damage to property as a result of such activity. The provisions of this section shall not affect the right of any person to receive benefits to which he would otherwise be entitled under this act or under the workmen's compensation law or under any pension law, nor the right of any such person to receive any benefits or compensation under any act of congress.

watermaster to divert excess water away from Mud Lake. We disagree.

There is no duty imposed on the canal companies and the water users by I.C. § 42–1204 that was breached by this authorization. The faulty premise of the landowners' argument is that by storing water in Mud Lake the canal companies and the water users become owners of the Mud Lake dike. The fact that water is stored in a reservoir does not make those who have rights to the water the owners of the dam that creates the reservoir.

## VI.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE LANDOWNERS AN INJUNCTION.

■ The landowners sought an injunction enjoining the governmental agencies, the canal companies and the water users from a course of conduct that would cause the flooding of the landowners' property. The trial court denied this relief on the ground that the flooding was the result of unprecedented flood waters. We find no clear abuse of discretion in the trial court's denial of the injunction. *Milbert v. Carl Carbon, Inc.*, 89 Idaho 471, 406 P.2d 113 (1965).

## VII.

### CONCLUSION.

We affirm the summary judgments granted by the trial court, except as to the landowners' claim for inverse condemnation. On this claim we remand to the trial court for further proceedings consistent with this opinion.

Because of the mixed results here, we award no costs on appeal or attorney fees to the governmental entities or the landowners. We award costs on appeal to the canal companies and the water users.

BAKES, C.J., concurring in all but Part IV.

BISTLINE and BOYLE, JJ., concur.

McDEVITT, Justice, specially concurring.

Concur as to sections I, II, III, V, VI. Specially concur with section IV, noting that the decision reached by this Court does not rely on *Restatement (Second) of Torts*, § 196, note (g). Concur with section VII, consistent with foregoing.

BAKES, Chief Justice, concurring in all but Part IV:

I dissent from Part IV of the majority opinion which states in part:

The statute invoked by the trial court provides a means for obtaining compensation for property that "was commandeered or otherwise used in coping with a disaster emergency and its use or destruction was ordered by the governor or his representative." I.C. § 46–1012(3). Claims for compensation must be filed with the bureau of disaster services. I.C. § 46–1012(4). The trial court ruled that the landowners could not pursue their inverse condemnation claim, because they did not exhaust the administrative remedy given to them in this statute. However, the statute does not provide for compensation unless the use or destruction of the property was ordered by the governor or his representative. The declaration of state of emergency by the governor on June 14, 1984, did not refer to the use or destruction of landowners' property. Neither IDWR nor any of the other governmental agencies is properly characterized as the "representative" of the governor in responding to the emergency. *There is no evidence here that the governor designated any of the governmental agencies as his representative.* Therefore, we hold that the landowners were not required to exhaust the remedy provided by I.C. § 46–1012, since that statute did not provide them with a remedy under the circumstances here.

*Ante* at 142, 786 P.2d at 533 (emphasis added). Because the director of the Idaho Department of Water Resources is properly designated as a "representative" of the Governor, I would affirm the trial

court's ruling that the landowners could not pursue their inverse condemnation claim because they did not exhaust the administrative remedy given to them in I.C. § 46–1012.

The majority opinion restricts the definition of "representative" too narrowly as if it was used in this statute to signify only a particular official known in the Idaho Code as "the governor's representative." While the use of the term "representative" no doubt includes the chief of the bureau of disaster services within the office of the Governor, there is nothing contained in the language of the State Disaster Preparedness Act excluding other representatives of the Governor who carry out emergency disaster relief measures. In fact I.C. § 46–1008(4) provides:

> During the continuance of any state of disaster emergency the governor is commander-in-chief of the militia and may assume command of all other forces available for emergency duty. To the greatest extent practicable, the governor shall delegate or assign command authority by prior arrangement embodied in appropriate executive orders or regulations, but nothing herein restricts his authority to do so by orders issued at the time of the disaster emergency.

In conformity with the spirit and letter of the Act, a "representative" of the governor could be any official acting within the scope of his lawful duties and in conformity with a disaster emergency effort as declared by the Governor. Such an official would include the director of the Idaho Department of Water Resources who performs disaster related duties, including actions taken to prevent or minimize disasters before the occurrence of such calamaties. As the majority opinion correctly observes, *ante* at 136, 786 P.2d at 527, "All agencies of state government were required by the proclamation 'to take action ... to arrest or alleviate the conditions perpetuating the state of extreme emergency.'"

The Idaho Department of Water Resources is part of the executive department of the state government and its director is duly appointed by the Governor in whom is vested the supreme executive power of the state. Idaho Constitution art. 4, §§ 5, 6; I.C. § 42–1701. Among the duties prescribed to the director is the duty "to perform such other professional duties as may be required of him by the governor." I.C. § 42–1706. I believe the term "representative" of the Governor, as used in I.C. § 46–1012(3), includes the director of the Idaho Department of Water Resources, who must "perform such other professional duties as may be required of him by the governor." I.C. § 42–1706. The State Disaster Preparedness Act envisions that the Governor and his representatives will cooperate and coordinate with other political subdivisions in meeting disasters. I.C. § 46–1003. Furthermore, the director of the Idaho Department of Water Resources is required by law to employ remedial means to protect life and property in an emergency situation concerning dams, reservoirs or mine tailings impoundment structures. I.C. § 42–1718.[3] In performing the "professional duties as may be required of him by the governor," and in employing the remedial means to protect life and property concerning dams, reservoirs, etc., the director is acting as a representative of the Governor.

---

3. **42–1718. Remedial means for protection of life and property.**—The director shall immediately employ any remedial means necessary to protect life and property if either:

(a) The condition of any dam, reservoir or mine tailings impoundment structure is so dangerous to the safety of life or property as not to permit time for the issuance and enforcement of an order relative to maintenance or operation.

(b) Passing or imminent floods threaten the safety of any dam, reservoir or mine tailings impoundment structure.

In applying the remedial means provided for in this act, the department may in emergency do any of the following:

(a) Lower the water level by releasing water from the reservoir or lower mine tailings slurry level by releasing slurry from the mine tailings impoundment structure.

(b) Completely empty the reservoir.

(c) Take such other steps as may be essential to safeguard life and property.

. . . .

Accordingly, I.C. § 46–1012(4) requires landowners to file with the bureau of disaster services a claim for compensation stemming from the destruction or use of property used in coping with a disaster emergency when such use or destruction was ordered by the Governor or his representative, in this case the director of the Idaho Department of Water Resources. The trial court did not err when it dismissed the plaintiff's action for failure to file claims for disaster compensation pursuant to I.C. § 46–1012(4).