# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45819

LAMONT BAIR ENTERPRISES, INC., an
Idaho corporation,

      Plaintiff-Appellant,

v.

CITY OF IDAHO FALLS, a municipal
corporation,

      Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Pocatello, September 2019 Term

Opinion Filed: December 6, 2019

Karel A. Lehrman, Clerk

---

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bonneville County. Dane H. Watkins, Jr., District Judge.

The district court's order granting summary judgment is affirmed.

Beard St. Clair Gaffney, P.A., Idaho Falls, for appellant. Jared W. Allen argued.

Hall Angell & Associates, LLP, Idaho Falls, for respondent. Blake G. Hall argued.

---

BRODY, Justice.

This case addresses discretionary function immunity under the Idaho Tort Claims Act. Lamont Bair Enterprises initiated this lawsuit against the City of Idaho Falls after a broken water main cracked the cement floor and flooded the basement of the company's rental property. Lamont Bair Enterprises alleged the City neglected its water pipes and failed to maintain its water system in a reasonably safe condition. The district court ruled the City was immune from liability under the Idaho Tort Claims Act's discretionary function exception.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Lamont Bair Enterprises, Inc. ("LBE") is an Idaho corporation based in Idaho Falls that owns residential rental units. One of LBE's rental units is a four-plex rental property at 547 South Skyline Drive ("the Property"). The Property is served by municipal water lines owned and maintained by the City of Idaho Falls ("the City").

1

On December 28, 2015, a municipal water main broke at the intersection of Brentwood Drive and Skyline Drive. The break caused water to flow beneath the Property's driveway, crack the concrete basement floor, and flood the basements of all four rental units. The City received an emergency call for assistance in shutting off the water. Believing the incident to be a service line leak (as opposed to a water main break), the City's response crew first closed the water service line and waited for confirmation that the water flow had stopped. After the crew received notice that water continued to flow into the basement, they isolated the leak to the water main and began repairing the main line. The repair order did not specify the condition of the pipe, only that the crew repaired the six-inch broken main line at a depth of four feet. The water was turned back on the following day, and the road and curb were filled back in. None of LBE's rental units ever experienced flooding from the city's water lines prior to this flooding incident at the Property.

LBE contends that the water main "ruptured" due to negligent care—that "the City neglected its water system to the point that literally miles of pipe became past their design life and in need of replacement," thus failing to exercise reasonable care in maintaining the water supply system. In support of LBE's negligence claim, it cites to the property manager's deposition, in which he testified, "I [had] four dry, empty basements, and then after the water main was leaking or had ruptured, l had four wet apartments. Outside of that, I'm -- I don't know what else to tell." The City alleges there was a "shear break" in the water line caused by shifting soils due to deep frost penetration, thereby making the water line's break outside the City's control or ability to prevent.

The City has over 314 miles of public pipeline, each made out of various materials, including asbestos cement, ductile iron, galvanized steel, and cast iron, each under the exclusive control and management of the City. The pipe at issue in this case was a six-inch cast iron pipe installed in 1958 or 1959, and had a life expectancy of 75 years. Thus, the pipe was approximately 56 years old and still within its original projected life expectancy. This pipeline was also located west of the Snake River where soil is allegedly "soft and sandy," thus allegedly making "an environment that is easy on the water lines" unlike the clay-based subsoils east of the Snake River.

In 2014, the City retained the engineering firm Murray Smith & Associates ("Murraysmith") to help prepare a water facility plan, including plans for pipeline replacement

and prioritization. The Water Facility Plan ("WFP") was adopted approximately six months before the flooding incident at the Property, but had been discussed and planned by the City for the preceding three years. The development of the WFP was "based on the City's resources, including manpower, machinery, budgetary constraints, and the public interest." The WFP recommended replacing the high priority pipes—the cast iron pipes installed between 1902 and 1959—within the next fifteen years to replace all pipes before the expiration of the water lines' life expectancies. In August 2015, the WFP was presented to the city council, with input from public comments and approval by the Idaho Department of Environmental Quality. The city council unanimously voted to adopt the plan, despite the resulting water fee increase, because the infrastructure was in need of repair.

LBE points to several problems identified in the City's WFP: (1) the City's water department is understaffed, distributing 1,633,000 gallons per day per full time equivalent employee as compared to a national median of 210,000 gallons per day per full time equivalent employee; (2) the City lacks official guidelines for system leak detections; (3) prior to the 2015 WFP, the City lacked a pipe replacement program; (4) the City has thirty years of data regarding water main breaks, which shows that 70 percent of those breaks occur in cast iron pipes installed between 1920 and 1959; and (5) previous data from 1950s cast iron pipe breaks described rusting and cracked pipelines, indicating "that the material is past its design life and [in] need of replacement."

LBE filed a notice of tort claim, pursuant to the Idaho Tort Claims Act ("ITCA"), on June 16, 2016. LBE then initiated this action by filing a complaint and demand for a jury trial against the City, alleging negligence and arguing that the doctrine of res ipsa loquitur applied. The City filed a motion for summary judgment, arguing that the City was entitled to immunity under the ITCA's discretionary function and construction design exceptions to liability set forth in Idaho Code sections 6-904(1) and (7).

The district court granted the City's motion for summary judgment, holding that Idaho Code section 6-904(1) granted the City immunity from liability. In its memorandum opinion and order, the district court explained that the City's pipe replacement plans were part of the government's planning and policy decision, making it a discretionary decision exempt from liability by the ITCA. The district court also found that the ITCA's design exception did not apply because LBE's claim did not assert a design flaw in the broken pipe. LBE timely appealed.

3

## II. STANDARD OF REVIEW

When this Court reviews a lower court's ruling on a summary judgment motion, this Court applies the same standard of review the lower court utilized in ruling on the motion. *Idaho First Bank v. Bridges*, 164 Idaho 178, 182, 426 P.3d 1278, 1282 (2018); *Hansen v. City of Pocatello*, 145 Idaho 700, 702, 184 P.3d 206, 208 (2008). Thus, summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bridges*, 164 Idaho at 182, 426 P.3d at 1282. Any disputed facts and reasonable inferences are construed in favor of the non-moving party, and the Court freely reviews the questions of law. *Id.*

## III. ANALYSIS

### A. The district court did not err in holding that the City is immune from suit pursuant to the discretionary function exception set forth in Idaho Code section 6-904(1).

The district court dismissed LBE's complaint with prejudice because Idaho Code section 6-904(1) granted the City immunity from liability. The district court explained that the City's pipe replacement plans were part of the government's planning and policy decision, and thus a discretionary decision exempt from liability under Idaho Code section 6-904(1). LBE contends that it alleged a viable tort action and that no exception to liability under the ITCA immunizes the City from liability. Moreover, because the City was required to maintain its water system in a reasonably safe condition, that duty was not discretionary. In support of its position, LBE asserts that Idaho Code sections 61-302 and 61-702 provide requirements the City must follow in managing its water systems.

In reviewing a motion for summary judgment that involves a question of immunity under the ITCA, the reviewing court must determine:

> [W]hether tort recovery is allowed under the laws of Idaho; and, if so, whether an exception to liability found in the tort claims act shields the alleged misconduct from liability; and, if no exception applies, whether the merits of the claim as presented for consideration on the motion for summary judgment entitle the moving party to dismissal.

*Harris v. State Dep't of Health & Welfare,* 123 Idaho 295, 298 n.1, 847 P.2d 1156, 1159 n.1 (1992). As a general rule, the ITCA provides that a government entity is liable for money damages arising out of negligent or otherwise wrongful acts of its employees committed in the scope of their employment if a private person would be liable for such acts under the laws of the state. I.C. § 6-903(1); *James v. City of Boise*, 160 Idaho 466, 482, 376 P.3d 33, 49 (2016). This

statute applies whether the alleged wrongful acts or omissions arise of out "governmental or proprietary" functions. I.C. § 6-903(1).

The ITCA provides several exceptions to governmental liability, as laid out in section 6-904 of the Idaho Code. The exception at issue in this case is subsection (1) of that statute, which states:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
>
> 1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

I.C. § 6-904(1). This statutory provision grants a governmental entity and its employees immunity from liability for performing discretionary functions. *See id.*

The discretionary function exception applies to governmental decisions that entail planning or policy formulations. *Dorea Enters., Inc. v. City of Blackfoot*, 144 Idaho 422, 425, 163 P.3d 211, 214 (2007). Determining the applicability of the discretionary function defense is a two-step process: first, the court must determine whether the nature of the challenged action is a routine, operational matter or an actual discretionary plan or policy; second, the court will examine the underlying policies of the discretionary function, which are to permit governance without undue inhibition from the threat of tort liability and to limit judicial examination of policy decisions entrusted to other government branches. *Id.* Discretionary decisions do not involve the execution or performance of statutory or regulatory policy. *Bingham v. Franklin Cnty.*, 118 Idaho 318, 321, 796 P.2d 527, 530 (1990). "Since discretionary functions involve actions qualitatively different from implementing policy, and since the former by definition involve the exercise of choice, judgment, and the ability to make responsible decisions, then discretionary functions must actually involve the formulation of policy." *Id.* In addition, while "[r]outine, everyday matters not requiring evaluation of broad policy factors" will likely be "operational" choices, decisions that involve "consideration of the financial, political, economic and social effects of a policy or plan will generally be planning and 'discretionary.'" *Id.* Where a governmental entity makes a discretionary decision, it is immune from liability; alternatively, if

5

the governmental entity makes an operational decision, it can be subject to liability where it failed to exercise ordinary care. *Id.*

The first step of the *Dorea* analysis requires this Court to "examine the nature and quality of the challenged action" to determine if it is operational or discretionary. 144 Idaho at 425, 163 P.3d at 214. If the challenged action is a routine, everyday matter, it is likely operational, meaning that step one of the inquiry fails and the discretionary exception does not apply. *Id.* If the challenged action involves a decision based on consideration of financial, political, economic, and social effects of a policy or plan, the action is discretionary, and the analysis moves to step two. *Id.* In its complaint, LBE challenges the City's "failure to exercise reasonable care in maintenance, repair, and replacement of its municipal water pipes." Importantly, LBE does not challenge any aspect of the City's conduct or response to the water main break on the day of the incident. Thus, we examine solely whether the City's maintenance, repair, and replacement of its municipal water pipes was operational or discretionary.

The challenged conduct in the first step of the analysis is central to the outcome of this case. LBE maintains that the district court erred in focusing on the City's WFP pipe replacement plan as the challenged conduct. Instead, LBE argues its claim rests on the City's failure to maintain its water pipes in a reasonably safe condition *before* the adoption of the WFP. In other words, LBE attempts to separate the nature of challenged conduct from the City's WFP. However, LBE cannot effectively separate challenging the City's maintenance, repair, and replacement of its municipal water pipes from the City's attempt to assess, identify, and replace aging water pipes—the WFP.

Over one year before the water main break at issue in this case, the City engaged Murraysmith to assess its water operations and formulate the WFP. Approximately six months before the water main break, the City adopted the WFP. The scope of Murraysmith's work in creating the WFP included developing "an ongoing repair and replacement program for system piping." The WFP contained plans for a pipe replacement program for the City, prioritizing specific sections of pipeline for replacement depending on the age, location, and material of the pipes. The WFP listed cast iron pipeline installed between 1920 and 1959—the exact type of pipe that broke in this case—as the highest priority for replacement. The WFP aimed to replace all of the City's cast iron pipelines installed in that time period in under twenty years. Thus, the conduct LBE challenges for the purpose of the discretionary function exception—the

6

maintenance, repair, and replacement of water pipes—cannot be examined without considering the WFP.

Using the standard set forth in *Dorea*, the nature and content of the WFP is discretionary. The City discussed adopting a plan for pipe replacement for three years prior to adoption. Further, in adopting the WFP, the City considered its available resources, including "manpower, machinery, budgetary constraints, and the public interest." Further, the WFP's "Scope of Work" set out to establish a "financial plan that identifies a funding strategy that supports the implementation of the [capital improvement program]," and "estimate the conceptual costs and analyze the financial impacts" of the plan. The City's decision to adopt the WFP examined the economic, social, political, and financial considerations of the plan, ultimately concluding that the WFP was necessary for prioritizing replacement for the City's aging pipeline. *Dorea*, 144 Idaho at 425, 163 P.3d at 214.

The City's decision to adopt the WFP was not an operational, everyday decision that carried out an existing policy. *See Dorea*, 144 Idaho at 425, 163 P.3d at 214. The City sought to create and adopt a policy based on the existing infrastructure of the City and its current financial resources. Had LBE challenged the City's conduct in response to the main break, such as the City's initial decision to cut off the service line rather than the main line, that conduct may have been operational. However, as noted above, LBE does not challenge any of the City's conduct responding to the flooding.

The facts of this case are nearly indistinguishable from *Dorea* itself, and the Court's analysis in that case supports the conclusion that the City's WFP was discretionary. In *Dorea*, Dorea Enterprises, Inc., sued the City of Blackfoot after the city flushed its blocked sewage lines, causing sewage to flood the basement of Dorea's apartment building. *Id.* at 424, 213. While Dorea argued that the city negligently operated its sewer system—having known of potential problems and having failed to remedy them—this Court affirmed that the ITCA granted immunity to the city under Idaho Code section 6-904(1). *Id.* at 425, 215. The city was legally required to maintain the sewage lines by flushing them every other year. *Id.* at 426, 215. Though the city was legally required to maintain the sewage lines in accordance with a particular standard, the Court found the city's decision to flush the sewage line annually to be discretionary because it was based on budgetary constraints, social and public policy considerations, as well as the city's resources to carry out the policy. *Id.* Here, the same budgetary, social, political, and

7

financial resource considerations that governed the city's decision in *Dorea* applied to the City's decision to create and adopt the WFP.

LBE maintains that this Court does not need to begin with the first step of the *Dorea* analysis, because the City had a duty to maintain its water pipes in a reasonably safe condition. Accordingly, LBE argues that the City cannot claim the benefit of a discretionary function defense where they had an affirmative duty to maintain the water pipes in a certain condition. We disagree. The City is required to maintain its water pipes in a reasonably safe condition, but the method and plan the City adopts to maintain its water pipes is precisely the type of decision this Court has found to be discretionary since the adoption of the ITCA. *See Dorea*, 144 Idaho at 426, 163 P.3d at 215; *Jones v. City of St. Maries*, 111 Idaho 733, 736–37, 727 P.2d 1161, 1164–65 (1986). *See also Marty v. State*, 117 Idaho 133, 141–42, 786 P.2d 524, 532–33 (Ct. App. 1989).

The second step of the *Dorea* analysis is to evaluate the underlying policies of the discretionary function exception. *Dorea*, 144 Idaho at 425, 163 P.3d at 214. These policies are to permit governance without undue inhibition from the threat of tort liability and to limit judicial examination of policy decisions entrusted to other government branches. *Id.* Finding the City's decision to adopt the WFP to be discretionary supports these policies. In *City of Lewiston v. Lindsey*, this Court recognized "[w]hen and how many financial and human resources" should be allocated to the tasks of running a city are "basic policy decisions properly entrusted to other branches of government, and it would contravene the purpose of the discretionary function exception" to allow the courts to review the city's decisions on those matters. 123 Idaho 851, 855–56, 853 P.2d 596, 600–01 (1993). Identifying, analyzing, and adopting solutions to meet a city's aging infrastructure needs are exactly the kind of decisions the legislature intended to be free of judicial second guessing. Further, local government should feel uninhibited by the threat of tort liability when creating and maintaining plans for future infrastructure needs.

This case comes down to a matter of timing. Based on this Court's decision in *Skaggs*, the City has been on notice for nearly 50 years that it lacked a water pipe replacement plan. *See Skaggs*, 90 Idaho at 4, 407 P.2d at 697. This Court specifically noted the City's prior pipe replacement strategy did nothing to "prevent leaks caused by rusting, nor did it institute any procedures to inspect or check the lines prior to an actual break." *Id.* at 7, 697 (emphasis removed). Even in the wake of *Skaggs*, it appears the City failed to formulate any kind of pipe

8

replacement program until it hired Murraysmith to complete the WFP in 2014. The timeliness of the City's response may be troubling, but ultimately the City adopted the pipe replacement plan in the WFP four months prior to the pipe break causing LBE's injury. Adopting the WFP set a plan in motion to replace all of the City's pipe coming to the end of its lifespan in the next twenty years. The timing of the City' response, although close, justifies the application of the discretionary function exception. In the alternative, punishing the City for failing to replace a pipe fast enough—notably, a pipe that was already prioritized for replacement—would contravene the policies behind the discretionary function exception. Such an outcome would dissuade local government from creating forward thinking plans to address aging infrastructures. Had the City failed to reach out to an engineering firm and formulate a plan prior to the main break in this case, this Court's analysis may have reached a different conclusion. However, because the City began the process of analyzing its water pipes in 2014, and adopted a plan to replace the exact type of pipe that broke in this case four months before the break, the ITCA gives the City immunity.

LBE argues that the discretionary function exception cannot apply in this case because where there is "a policy in place requiring specific conduct, such conduct cannot, by definition, be discretionary." LBE asserts that *Hansen v. City of Pocatello*, 145 Idaho 700, 703, 184 P.3d 206, 209 (2008), establishes a policy requiring that municipalities maintain their water systems in a reasonably safe condition. *Id.* LBE argues because policy directed the City to maintain its water system in a reasonably safe condition, the City cannot have the benefit of discretion. Further, LBE argues that Idaho's public utilities laws under Idaho Code sections 61-302 and 61-702 also establish a policy that requires the City to maintain its water system in a reasonably safe condition. We disagree.

*Hansen* is inapplicable to this case for two reasons. First, *Hansen* involves a tort claim against a city that was not brought under the ITCA. *Id.* at 701, 184 P.3d at 207. In fact, this Court noted in *Hansen* that the record contained no indication "that [the plaintiff] filed a notice of tort claim under the [ITCA] or that the City asserted a sovereign immunity defense." *Id.* at 701 n.1, 207 n.1. LBE argues that where a policy to maintain a water system in a reasonably safe condition exists, like in *Hansen*, the City cannot have the benefit of the discretionary function exception. However, the *Hansen* Court did not address the ITCA or its exceptions in its decision.

9

Thus, the analysis provided in *Hansen* has no bearing on a case within the framework of the ITCA.

Second, even if the *Hansen* decision did analyze the discretionary function exception, the facts of *Hansen* are distinct from this case. In *Hansen*, the plaintiff was injured when she stepped on an unsecured water meter cover. *Id.* at 701, 184 P.3d at 207. A city employee removed and re-secured the water meter cover nine days prior to the accident. *Id.* The only evidence produced by the city regarding the operation of the water meter cover was evidence of its employee's normal practices in removing and re-securing the covers. *Id.* at 703, 184 P.3d at 209. Unlike *Hansen*, the City in this case identified that its water pipes needed replacement, and adopted a plan that prioritized the replacement of the water pipes most at risk in the future. The city in *Hansen* had not identified water meter covers as a problem, nor had the city implemented a plan to address any specific problems with the water meter covers based on current infrastructure and available resources.

Similarly, Idaho's public utilities laws do not apply to this case. Idaho's public utilities laws are codified in Idaho Code section 61-101 *et seq*. Idaho Code section 61-129 defines a "public utility" as "every common carrier, pipeline corporation, gas corporation, electrical corporation, telephone corporation and water corporation, as those terms are defined in this chapter . . . ." I.C. § 61-129. The City does not qualify as either a pipeline corporation or a water corporation as defined by the statutes. *See* I.C. §§ 61-114–115, 61-125.

Idaho Code section 61-114 defines "pipeline" as "all real estate, gathering lines, fixtures and personal property [used] . . . to facilitate the transmission, storage, distribution or delivery of natural gas or manufactured gas, crude oil or other fluid substances *except water through pipelines*." I.C. § 61-114 (emphasis added). Under this provision, the City does not qualify as a pipeline corporation.

Idaho Code section 61-125 defines a "water corporation" as "*every corporation or person*, their lessees, trustees, receivers or trustees, appointed by any court whatsoever owning, controlling, operating or managing any water system for compensation within this state." I.C. § 61-125 (emphasis added). The statute defining "corporation" expressly states that corporations do "not include a municipal corporation, or mutual nonprofit or cooperative gas, electrical, water or telephone corporation or any other public utility organized and operated for the service at cost and not for profit, whether inside or outside the limits of incorporated cities, towns or villages."

10

I.C. § 61-104. Idaho case law also supports the conclusion that utilities owned by municipalities are not subject to Idaho's public utilities laws or the jurisdiction of the Public Utility Commission. *See, e.g.*, *Snake River Homebuilders Ass'n, v. City of Caldwell*, 101 Idaho 47, 49, 607 P.2d 1321, 1323 (1980) (finding that the City of Caldwell's water system was not a public utility for the purposes of the public utilities laws). Accordingly, LBE's argument regarding the application of these statutes fails.

Finally, LBE argues that three factually similar cases all support the proposition that a municipal water corporation acting in a proprietary capacity, such as owning and operating a water system, is subject to liability for damages arising out of its negligence. *See Skaggs Drug Ctrs., Inc. v. City of Idaho Falls*, 90 Idaho 1, 7, 407 P.2d 695, 697 (1965); *C.C. Anderson Stores Co. v. Boise Water Corp.*, 84 Idaho 355, 362, 372 P.2d 752, 756 (1962); *Yearsly v. City of Pocatello*, 71 Idaho 347, 353, 231 P.2d 743, 747 (1951). While these cases do stand for the proposition stated, they do not factor into our analysis of this case. Because these cases predate Idaho's adoption of the ITCA in 1971, *Skaggs*, *C.C. Anderson*, and *Yearsly* cannot be used to sidestep the discretionary function exception to liability that the ITCA now requires. Therefore, LBE's reliance on these precedents is misplaced.

Accordingly, we affirm the district court's determination that the City is immune from suit pursuant to Idaho Code section 6-904(1). We do not reach the merits of the other issues LBE has raised on appeal.

## IV. CONCLUSION

We affirm the district court's decision granting summary judgment to the City because it is immune from suit under Idaho Code section 6-904(1). Pursuant to Rule 40 of the Idaho Appellate Rules, we award costs on appeal as a matter of course to the City.

Chief Justice BURDICK, and Justices BEVAN, STEGNER and MOELLER CONCUR.

11